Katherine NAVARRE, Respondent,

v.

SOUTH WASHINGTON COUNTY
SCHOOLS, Petitioner,
Appellant,

Northwest Publications d/b/a/ Pioneer
Press, et al., Defendants.

No. C4–00–2242.

Supreme Court of Minnesota.

Oct. 10, 2002.

Knutson, Flynn, & Deans, Lawrence J. Hayes, Jr., # 42821, Jennifer K. Anderson, # 253789, Mendota Heights, MN, Attorney for Appellant.

Stephen W. Cooper, # 18788, Kathryn J. Cima, # 228059, Minneapolis, MN, Attorney for Respondent.

Mark A. Anfinson, # 2744, Minneapolis, MN, Attorney for amicus curiae, Minnesota Newspaper Association.

## OPINION

GILBERT, Justice.

Respondent Katherine Navarre brought suit against appellant South Washington County Schools seeking damages for several claims, including multiple violations of the Minnesota Government Data Practices Act (MGDPA). Ultimately, a jury trial was held and respondent received a verdict in her favor in the amount of $520,000. The court of appeals reversed and remanded for a new trial. We are now asked to resolve multiple issues related to the MGDPA claims.

Respondent began her employment with appellant in January 1988 and began working at Hillside Elementary School, one of appellant's schools, in the fall of 1996 as the sixth-grade communications teacher. During the 1996–1997 school year, appellant received several complaints from teachers, students, and parents regarding respondent's teaching, her treatment of students, and her ability to control her classroom. Hillside Principal Timothy Bess informed respondent of the concerns expressed by parents and students in a letter dated April 18, 1997, specifically telling respondent that parents were concerned about respondent being inconsistent in her communications with them and their children and about one parent's concern that respondent was not teaching the curriculum. Appellant also commenced an investigation in April 1997 and placed respondent on a paid leave of absence beginning May 15, 1997.[1] On May 19, 1997, Bess sent a letter to all sixth-grade parents advising them that respondent had been placed "on a medical leave for the remainder of this school year."

On May 28, 1997, Assistant Superintendent Stanley Hooper sent the sixth-grade

---

1. The letter sent to respondent stated, "you are hereby placed on a temporary suspension and leave of absence pursuant to [Minn.Stat. § 125.12, subd. 7]." This section has since been renumbered but the language remains the same:

 **Suspension and leave of absence for health reasons.** Affliction with active tuberculosis or other communicable disease, mental illness, drug or alcoholic addiction, or other serious incapacity shall be grounds for temporary suspension and leave of absence while the teacher is suffering from such disability. Unless the teacher consents, such action [shall] be taken only upon evidence that suspension is required from a physician who has examined the teacher. Minn.Stat. § 122A.40, subd. 12 (2000). Appellant concedes that respondent was not in fact afflicted with any of these illnesses or disabilities when she was placed on medical leave but that determination was not challenged.

parents a second letter, indicating that appellant would administer the communications portion of the Iowa Test of Basic Skills to evaluate what their children had learned. This letter also stated:

> [P]arents have a * * * concern about knowing whether their children have been successful in the Communications curriculum, and that the stories from children are numerous and sometimes alarming regarding the characteristics of the instructional program they received.

One of the parents faxed this letter to *Pioneer Press* reporter Theresa Monsour, who then interviewed Hooper on May 29, 1997. In this interview, Hooper provided Monsour with details about the complaints and appellant's response to these complaints. According to Monsour's notes, Hooper told her the following:

> parents have called hillside. teachers have sat kids down and talked in detail. some said did do some things. we aren't comfortable that some of what they are talking about isn't valid. so doing standardized to see what learned.

> said parents were calling principal and said getting strong stories about what was going on. one day principal did sub. he asked children more information based on what parents were talking about. he had been aware of some of those issues for while. frequency of calls. some parents were concerned about their children but weren't attributing it to lack of instruction. others said towards spring of year, problems.

> some children described it as social hour. teacher had difficulty in classroom management. from kids point of [view], out of hand. principal, he indicated that may have been the case. he was not seeing that in other classrooms. kids move from room to room. were not having difficulty in other rooms.

> * * * *

> had not had other problems that i know of. nothing where anything formal had been done.

> * * * *

> it's unusual in terms of number of parents calling dr. bess and myself.

> i've had four calls and others pending. playing [telephone] tag. bess has had more than that.

> said district had been working with the teacher. the teacher had been responding to what teacher was, helping her learn better classroom management. earliest calls from parents there were concerns about not learning in classroom. principal worked with teacher to get documentation that teacher had been working with the students, examples of student work. she was providing some information in response to that.

> said he didn't get calls until this spring. first was two weeks ago. doesn't know how long bess has.

> said year started out okay, [classroom] management okay. [fell] apart with spring.

> * * * *

> she was asked for grades, she gave [out] grades. she did give some homework out during the year.

On May 30, 1997, the *Pioneer Press* published an article with the headline "100 kids who learn 'nothing' face summer school." This article identified respondent by name and discussed the concerns about respondent's teaching that parents and students had reported to appellant, at times directly quoting Hooper and at other times attributing the source of the information to Hooper. That same day, Superintendent Dan Hoke issued a press release, stating:

> I am here today to respond to allegations that 6th graders at Hillside Ele-

mentary School did not learn anything this year and that their communications teacher is incompetent.

These allegations are extremely serious and we are continuing our investigation. The allegations are serious enough and substantiated enough that we took the action of suspending the teacher and testing the students.

\* \* \* \*

We first heard concerns about the situation last fall, when parents called to report that their children were having difficulty learning the communications curriculum.

\* \* \* \*

This spring the concerns shifted from concern about student performance to concern about the teacher's teaching methods. These concerns were investigated by the principal at the time and the investigation continues.

*KARE 11* news also played a portion of a videotaped interview with Hoke on May 30, 1997, in which he stated:

**Hoke:** The allegations I've heard were that kids weren't learning.

**Question:** Which means she wasn't teaching?

**Hoke:** Correct. \* \* \* [The principal] would visit with the teacher. He would observe the teacher and then eventually he started into the classroom to teach for himself. So as he got more and

more evidence, he was also concerned. By us admitting there was something wrong by suspending the teacher.

On June 5, 1997, Hoke sent a letter to staff stating that appellant had "placed a teacher on paid leave until the end of the school year arising out of student and parent complaints."

On July 3, 1997, appellant's human resources manager, Perry Palin, responded by letter to a written request from Monsour for information about respondent. Palin's letter included respondent's name, salary, education, work experience, and the following statement: "[Appellant] received complaints from parents and students alleging concerns involving Ms. Navarre's classroom management and instructional methods."

Respondent brought this action in July, 1997, alleging that appellant published untrue and damaging allegations about respondent and seeking damages for: (1) defamation, (2) multiple MGDPA violations, (3) negligent infliction of emotional distress, and (4) intentional infliction of emotional distress.[2] Ultimately, respondent ended her employment with appellant at the beginning of the 1997–1998 school year. Although respondent never amended her complaint to allege constructive discharge or seek wage loss damages for her MGDPA claim, she did argue these claims to the jury.[3]

**2.** The complaint also named Northwest Publications d/b/a/ *Pioneer Press,* Timothy Bess, Dan Hoke, Jim Gelbmann, and Stan Hooper as defendants. By order dated July 29, 1999, the district court ordered summary judgment for the *Pioneer Press* on all counts and dismissed all of the other individual defendants from the lawsuit. Respondent never appealed the district court's summary judgment order as to any of these defendants.

**3.** On August 21, 1997, appellant sent respondent a letter assigning her to a teaching position at Woodbury Elementary School, where

respondent had worked before and had a good relationship with the principal. Appellant also sent respondent a "plan of assistance" designed to correct problems appellant believed to exist based on its investigation of the complaints during the 1996–1997 school year. Respondent did not return to work and instead requested a medical leave through September 29, 1997. Respondent also filed a grievance around that time. Appellant denied the grievance. Respondent did not pursue arbitration but did proceed with her lawsuit.

In April 1999, appellant brought a motion for summary judgment as to respondent's entire lawsuit. Respondent also filed a motion for summary judgment on her MGDPA claim, alleging that appellant's statements to the press and parents regarding the substance of the complaints violated the MGDPA. In July 1999, the district court granted appellant's motion on all counts except the MGDPA claim and partially granted respondent's motion for summary judgment. Specifically, the court recognized that respondent alleged six violations of the MGDPA: (1) Bess's May 19, 1997 letter to parents, (2) Hooper's May 28, 1997 letter to parents, (3) the quotes attributed to Hooper appearing in the May 30, 1997 *Pioneer Press* article, (4) the other information in the May 30, 1997 *Pioneer Press* article attributed to Hooper, (5) Hoke's June 5, 1997 letter to staff, and (6) Palin's July 3, 1997 letter to Monsour. The court held that Hooper's May 28 letter, Hooper's direct quotes in the May 30 article, and Hoke's June 5 letter did not violate the MGDPA. However, the court held that Bess's May 19 letter and Palin's July 3 letter were both MGDPA violations and that there was a factual dispute as to a third alleged violation, which involved the extent of information Hooper in fact supplied to the Pioneer Press. Finally, the court found that there was no evidence that any of the violations were willful.

On June 2, 2000, respondent served a motion in limine requesting the court to exclude as irrelevant all testimony that either stated or implied that respondent's teaching performance during the 1996–1997 school year was unsatisfactory and also requesting that the court not allow respondent's medical records to be introduced at trial. In response, appellant argued that evidence of respondent's performance during the 1996–1997 school year was relevant to counter respondent's claim for reputation damages by showing that the complaints about respondent were public knowledge prior to any dissemination of data by appellant. In addition, appellant argued that respondent's medical records were relevant to respondent's emotional damage claim because her medical records revealed that she was dealing with emotional problems unrelated to appellant's actions. Appellant also filed its own motion in limine, requesting that various writings and statements that the court had already determined were not violations of the MGDPA be excluded from trial as irrelevant. The court granted both of respondent's motions and denied appellant's motion.

The case was tried before a jury. Before opening statements, respondent's counsel requested the court to instruct the jury at the beginning of the case that the court had ruled on two of the data privacy issues and it would be up to the jury to decide whether a third violation had occurred and to decide damages. The court agreed to give such an instruction but never did so.

Respondent and her father were the only witnesses that testified about respondent's alleged emotional and loss of reputation damages. Respondent's father testified that respondent was distraught and upset about the *Pioneer Press* article and the *KARE 11* news coverage. He testified that respondent had never before in her adult life had an emotional reaction like the one she had following the newspaper article and television story about her teaching. He further testified that he encouraged respondent not to go back to teaching elementary school in the area because "her job * * * attractiveness as a candidate would effectively have been destroyed anywhere in the Midwest." Appellant attempted to cross-examine respondent's father about whether he was aware

of respondent being treated for various emotional problems prior to May 1997 but the court sustained respondent's objection to this line of questioning.

Respondent testified that her classroom management was never mentioned to her prior to her being told she was being placed on medical leave. She further testified that she heard from over 50 people indicating that they were aware of the *Pioneer Press* article and television coverage. She testified that the impact of the news media coverage was devastating to both her career and personal life and that the media coverage left her "very sad, very depressed, lonely, [and] isolated." Respondent did not present any expert testimony pertaining to a medical diagnosis of her condition.

Appellant requested that it be allowed to question respondent about her preexisting mental state but the court denied this request. Appellant also sought to question respondent about the various counts and parties that had been dismissed and have the court instruct the jury about dismissing respondent's other causes of action and the other defendants from the case. The court denied these requests as well. Later in the trial, appellant sought to call three sixth-grade teachers to testify that respondent did in fact know about the parent and student complaints prior to her being placed on medical leave, thereby impeaching respondent. The court also denied this request.

At the conclusion of the presentation of evidence, respondent brought a motion requesting that the court revisit whether Hooper's May 28 letter and Hoke's June 5 letter violated the MGDPA and to rule on whether the comments in the May 30 *Pioneer Press* article attributed to Hooper violated the MGDPA. Respondent also asked the court to rule on two other alleged MGDPA violations that respondent had not previously asked the court to rule on: Hoke's May 30 statement to *KARE 11* and Hoke's May 30 press release. In response, appellant argued that the court should not change its prior rulings as to Hooper's May 28 letter and Hoke's June 5 letter and that none of the disclosures violated the MGDPA. The court again found that Hoke's June 5 letter did not violate the MGDPA but that all of the remaining disclosures, including Hoke's statement to *KARE 11* and his press release, violated the MGDPA.

Appellant moved for dismissal, arguing that respondent could not recover reputation damages under the MGDPA and could not recover emotional damages where respondent's separate claims of negligent and intentional infliction of emotional distress were dismissed by the court. Appellant also argued that a jury instruction should be given indicating that certain counts and parties had been dismissed from the case. The court implicitly denied all of appellant's requests, stating that it "noted" the arguments and then moved forward.

At the conclusion of closing arguments, appellant moved for a mistrial, arguing that several arguments made by respondent's attorney during his closing argument and objected to by appellant were improper. The court denied this motion and instructed the jury that there were a number of statements from 6 different disclosures that the court had found were violations of the MGDPA, specifically identifying each of these statements. These violations included Bess's May 19, 1997 letter, Hooper's May 28, 1997 letter, statements made by Hooper to Monsour on May 29, 1997, statements made by Hoke in his press release on May 30, 1997, statements made by Hoke in his interview with *KARE 11* on May 30, 1997, and Palin's July 3, 1997 letter. The jury returned a

verdict in favor of respondent for $520,000, awarding $200,000 for loss of reputation, $250,000 for emotional distress, and $70,000 for loss of income or earning capacity. Appellant moved for judgment notwithstanding the verdict or, alternatively, for a new trial or remittitur. The court denied this motion in its entirety and appellant appealed.

The court of appeals reversed and remanded for a new trial. *Navarre v. South Washington County Schools*, 633 N.W.2d 40, 58 (Minn.App.2001). In doing so, the court of appeals held that some of Hooper's statements to Monsour were not government data and, therefore, the district court erred by submitting these statements to the jury. *Id.* at 51–52. The court of appeals also held that only a portion of Hoke's May 30 statements to *KARE 11* violated the MGDPA and that the only other violations were a portion of Hoke's May 30 press release and Palin's July 3 letter. *Id.* at 52–53. The court of appeals further held that the district court abused its discretion by prohibiting appellant from presenting evidence of respondent's preexisting emotional problems and prior reputation and erred by submitting respondent's loss of reputation and wage-loss claims to the jury. *Id.* at 58. For all of these reasons, the court of appeals reversed and remanded for a new trial. Despite the favorable holding, appellant petitioned for further review, arguing that the court of appeals' decision left several issues still unresolved. Respondent cross-petitioned and we granted both parties' petitions.

We are asked to consider four issues. First, did the district court err in determining that appellant violated the MGDPA? Second, did the court abuse its discretion by precluding appellant from presenting evidence either of respondent's preexisting emotional problems or preexisting reputation and/or did the court err by denying appellant's motion for a directed verdict on respondent's claims for emotional and loss of reputation damages? Third, did the court err by denying appellant's motion for JNOV on respondent's constructive discharge and wage loss claims? Finally, did the court err by denying appellant's motion for JNOV based on respondent's counsel's alleged misconduct, the jury's alleged misconduct, or the court's instructions to the jury?

### I.

When a district court considers a motion for JNOV it must view the evidence in the light most favorable to the nonmoving party and determine whether the verdict is manifestly against the entire evidence or whether despite the jury's findings of fact the moving party is entitled to judgment as a matter of law. *Pouliot v. Fitzsimmons*, 582 N.W.2d 221, 224 (Minn.1998). The denial of a motion for JNOV is subject to de novo review. *Id.* The district court must be affirmed, if, in considering the evidence in the record in the light most favorable to the prevailing party, "there is any competent evidence reasonably tending to sustain the verdict." *Id.* (quoting *Rettman v. City of Litchfield*, 354 N.W.2d 426, 429 (Minn.1984)). In regards to a motion for a new trial, we will not set aside a jury verdict on an appeal from a district court's denial of a motion for a new trial "unless it is 'manifestly and palpably contrary to the evidence viewed as a whole and in the light most favorable to the verdict.'" *Raze v. Mueller*, 587 N.W.2d 645, 648 (Minn.1999) (quoting *Roemer v. Martin*, 440 N.W.2d 122, 124 (Minn.1989)). We must reconcile the special verdict answers in "a reasonable manner consistent with the evidence and its fair inferences." *Id.* (quoting *Reese v. Henke*, 277 Minn. 151, 155, 152 N.W.2d 63, 66 (1967)).

■ Appellant first argues that, based on the evidence submitted at trial, it was entitled to JNOV because it did not release any private personnel data in violation of the MGDPA. Alternatively, appellant argues that even if any of the statements released did include private personnel data, such release was justified under the MGDPA. The court of appeals held that not all of the statements submitted to the jury constituted MGDPA violations but that some violations were properly found to exist and that appellant was not justified in releasing the data included in these violations. *Navarre,* 633 N.W.2d at 50.

■■ The Minnesota Government Data Practices Act "regulates the collection, creation, storage, maintenance, dissemination, and access to government data" and "establishes a presumption that government data are public and are accessible by the public for both inspection and copying." Minn.Stat. § 13.01, subd. 3 (2000). Whether appellant disseminated personnel data in violation of the MGDPA involves our construction of the MGDPA, which is a question of law subject to de novo review. *Doe v. Minnesota State Bd. of Med. Exam'rs,* 435 N.W.2d 45, 48 (Minn.1989). "[P]ersonnel data are data that identify the employee who is the subject of the data." *Demers v. City of Minneapolis,* 468 N.W.2d 71, 73 (Minn.1991). All personnel data not delineated by Minn.Stat. § 13.43, subds. 2 (Supp.2001), 3 (2000), as public data are private data. *Id;* Minn. Stat. § 13.43, subd. 4 (2000). Public data includes, in part, "the existence and status of any complaints or charges against the employee, regardless of whether the complaint or charge resulted in a disciplinary action." Minn.Stat. § 13.43, subd. 2(a)(4).

"[T]he final disposition of any disciplinary action together with the specific reasons for the action and data documenting the basis of the action" are also public data, with a final disposition occurring once there is a final decision about the disciplinary action. *Id.,* subd. 2(a)(5), 2(b).

■ Respondent argues that these provisions of the MGDPA mean that when someone lodges a complaint against a public employee, the employer cannot disclose the specific allegations and reasons for the allegations until final disposition of a disciplinary action because such information is private data. The MGDPA establishes a presumption that government data are public. Minn.Stat. § 13.01, subd. 3. However, the legislature has also carved out exceptions to public data for certain personnel data. Section 13.43, subdivision 4 provides that all other personnel data not specified as public data in section 13.43, subdivisions 2 to 3, is private data on individuals. Minn.Stat. § 13.43, subd. 4. Based on subdivision 2, 3, and 4's explicit language and pending final disposition of any disciplinary action as provided in subdivision 5, we hold that section 13.43, subdivision 2(a)(4), only authorizes the disclosure of the existence and status of complaints and nothing more. The type of complaint is separate and distinct from its existence and status.[4] Had the legislature desired the type of complaint to be disclosed before final disposition of any disciplinary action, it could have easily so provided, but it did not.

■ Thus, a government entity's public comments before final disposition of any disciplinary action are limited to the possi-

4. According to the American Heritage Dictionary, the word "type" means "kind" or "category." *American Heritage Dictionary College Edition,* 1309 (2d ed.1982). The word "status" means "[a] stage of progress or develop-

ment." *Id.* at 1191. The word "existence" means "occurrence" or "specific presence." *Id.* at 475. Clearly, the word "type" is not synonymous with either the word "existence" or the word "status."

ble existence of a complaint or complaints or charges against a government employee. Any disclosure by the government entity during the investigation that describes any quality or characteristic of the complaint, whether general or specific, goes beyond the mere existence of the complaint, and therefore violates section 13.43, subdivision 2(a)(4). Here, there is no dispute that the alleged violations of the MGDPA occurred prior to a final disposition of a disciplinary action. Therefore, we must decide whether the data disclosed by appellant was public data even though it was disclosed prior to a final disciplinary action.

### A. Bess's May 19, 1997 letter to all sixth-grade parents

■ The district court granted summary judgment for respondent as to this letter, holding that while use of the term "paid leave" would not violate the MGDPA, Bess's letter violated the MGDPA because the word medical was used in conjunction with the word leave. The court of appeals held that this was err. *Navarre*, 633 N.W.2d at 51.

The MGDPA classifies as public:

[D]ata that are only used to account for employee's work time for payroll purposes, except to the extent that the release of time sheet data would reveal the employee's reasons for the use of sick or other medical leave * * *.

Minn.Stat. § 13.43, subd. 2(a)(8). Respondent argues that this section did not permit appellant to reveal that respondent was on "medical" leave because Bess was not responding to questions relating to respondent's payroll status. However, the statute classifies as public "data * * * used to account for employee's work time for payroll purposes" and only prohibits revealing *"the employee's reasons for the use of sick or other medical leave." Id.* (emphasis added). There is no need to except the reasons for a medical leave from that which is public unless the fact that the employee is on a medical leave is public in the first place.[5]

While respondent argues that she was not on a "real" medical leave, the propriety of the decision to place respondent on a medical leave is not before us and is irrelevant as to whether appellant violated the MGDPA by disclosing that it had in fact placed respondent on a paid medical leave. In fact, respondent requested the medical leave be extended through September 29, 1997. We hold that this information is encompassed within the statutory "comparable data * * * used to account for employee's work time for payroll purposes," which here was a paid leave—that is an absence from work coupled with an expenditure of public funds for payroll purposes. Minn.Stat. § 13.43, subd. 2(a)(8). Accordingly, we affirm the court of appeals and hold that the district court erred by instructing the jury that Bess's May 19, 1997 letter violated the MGDPA.

### B. Hooper's May 28, 1997 letter to all sixth-grade parents

■ The district court initially held this letter did not violate the MGDPA in its summary judgment order. However, after all of the evidence had been submitted, which included the introduction of evidence related to Hooper's May 28, 1997 letter over appellant's objections, the court

---

5. The Minnesota Commissioner of Administration, who is statutorily authorized under Minn.Stat. § 13.072 to issue advisory opinions regarding the MGDPA, has concluded that "the fact that an employee is on administrative leave for medical reasons" is public data. Op. Minn. Dept. Admin. No. 99–019 (July 7, 1999). While not binding authority, this persuasive authority supports our holding.

reversed its previous ruling and held that the letter violated the MGDPA by stating "the stories from children are numerous and sometimes alarming regarding the characteristics of the instructional program they received." The court of appeals held that this was err, reasoning that the letter did not identify respondent by name and any implicit reference to her was incidental. *Navarre*, 633 N.W.2d at 51.

Under the MGDPA, "the existence and status of *any complaints or charges* against the employee" is public personnel data. Minn.Stat. § 13.43, subd. 2(a)(4) (emphasis added). The fact that *"any complaints or charges"* is plural indicates that the number of complaints or charges is public data. Therefore, disclosing the fact that the stories were "numerous" did not violate the MGDPA.

 We must next consider whether the letter's indication that these stories were "sometimes alarming" discloses more than "the existence and status of any complaints." "Personnel data" within the meaning of the MGDPA is defined as "data on individuals * * *," which in turn means:

> [A]ll government data in which any individual is or can be identified as the subject of that data, unless the appearance of the name or other identifying data can be clearly demonstrated to be only incidental to the data * * *.

Minn.Stat. §§ 13.43, subd. 1 (2000), 13.02, subd. 5 (2000). *See also Demers*, 468 N.W.2d 71, 73 (Minn.1991) (stating that "personnel data are data that identify the employee who is the subject of the data").

The court of appeals concluded that respondent was not the subject of and was not identified in Hooper's letter and any implicit reference to her was incidental to the subject of the letter. Therefore, the court held that information in the letter was not personnel data. *Navarre*, 633

N.W.2d at 51. However, the court failed to recognize that in the beginning of Hooper's May 28, 1997 letter, immediately after indicating that Hillside's sixth-grade staff and principal had met with others to discuss the sixth-grade communications program, Hooper wrote: "We recognize that parents have a * * * concern about * * * the Communications curriculum," and then wrote the sentence at issue. This letter clearly indicated that it pertained to the sixth-grade communications curriculum. Respondent was the sixth-grade communications teacher. Therefore, respondent was readily identifiable as the subject of the "sometimes alarming" stories regarding the instructional program the children received. The use of the phrase "sometimes alarming" in describing the stories goes beyond disclosing the existence and status of complaints by commenting on the nature of the complaints still under investigation and was disseminated prior to any final disposition of disciplinary action. Accordingly, we reverse the court of appeals' holding in part and hold that the district court did not err by instructing the jury that the public characterization of the complaints as "sometimes alarming" violated the MGDPA.

### C. *Hooper's May 29, 1997 statements to Monsour*

At summary judgment, the district court held that there was a factual question as to which statements attributed to Hooper in Monsour's notes and in the *Pioneer Press* article were actually made by Hooper. At trial, Hooper admitted that he told Monsour all of the information contained in her notes and, based on this admission, the court held that the majority of these statements violated the MGDPA. The court of appeals held that four of Hooper's statements were erroneously submitted to the

jury because they were not recorded in physical form or derived from recorded information and were therefore not government data. *Navarre,* 633 N.W.2d at 52.

The definition of "personnel data" includes "data on individuals," as defined by Minn.Stat. § 13.02, subd. 5. Certain personnel data is public. *See* Minn.Stat. § 13.43, subd. 2. The definition of "data on individuals" includes "government data," which is defined as "all data collected, created, received, maintained, or disseminated * * * regardless of its *physical* form, storage media or conditions of use." Minn.Stat. § 13.02, subds. 5, 7 (2000) (emphasis added). The legislature also provides that some personnel data that is private may become public for a number of reasons, including the final disposition of disciplinary action and data documenting that action. *See* Minn.Stat. § 13.43, subd. 2(a)(5).

▬▬ While we have not yet interpreted the statutory definition of "government data," the court of appeals has held that to constitute "government data," the data must be recorded in some physical form. *Deli v. Hasselmo,* 542 N.W.2d 649, 653–54 (Minn.App.), *review denied* (Minn. Apr. 16, 1996). The court of appeals has also held that unrecorded mental impressions are not "government data." *Keezer v. Spickard,* 493 N.W.2d 614, 617–18 (Minn.App.), *review denied* (Minn. Feb. 12, 1993). These cases are in line with the section of the MGDPA explaining its scope, which states that the MGDPA "establishes a presumption that government data are public and are accessible by the public for both inspection and copying * * *." Minn.Stat. § 13.01, subd. 3. Because an individual's mental impressions cannot be inspected or copied, it follows that they do not constitute government data and therefore are not personnel data.

Accordingly, disclosing such mental impressions to the public does not violate the MGDPA. However, pending final disposition of any disciplinary action, the disclosure of mental impressions derived directly from personnel data recorded in some physical form or storage media, or derived directly from complaints or charges against the employee, is private data on individuals.

▬▬ The court of appeals concluded that the majority of Hooper's statements were either recorded in or derived from Bess's April 18, 1997 letter to respondent and Hooper's May 28, 1997 letter to sixth-grade parents. *Navarre,* 633 N.W.2d at 52. As discussed above, Hooper's letter disclosed private personnel data insofar as it indicated the stories from children were "sometimes alarming." Bess's letter also included private personnel data in that it included information about the specific facts surrounding the complaints. A close reading of Hooper's statements to Monsour reveals that the court of appeals correctly concluded that a majority of his statements related to the data included in these two letters. Most of Hooper's statements based on the data in Bess's April 18, 1997 letter and Hooper's May 28, 1997 letter disclosed more than the mere existence or status of the ·complaints against respondent by describing the specific facts surrounding the complaints from parents and students rather than merely disclosing the type of complaints in a general manner. At the same time, one of the statements the district court found to violate the MGDPA, a finding affirmed by the court of appeals, only disclosed that appellant had received multiple calls about respondent. Hooper told Monsour, "I've had four calls and others pending. Playing telephone tag. Bess has had more than that." As discussed above, the number of complaints is public data under Minn.Stat.

§ 13.43, subd. 2(a)(4). Therefore, we reverse the court of appeals as to this statement about the number of calls and hold that it did not violate the MGDPA.

■ We now turn to Hooper's four statements that the court of appeals held were not government data because they were not derived directly from any data collected, created, received, maintained or disseminated in a physical form. These statements were: (1) "[respondent] had not had other problems that I know of. Nothing where anything formal had been done." (2) "[Bess] was not seeing that in other classrooms. Kids move from room to room. We're not having difficulty in other rooms." and (3) "district had been working with the teacher. The teacher had been responding to what teacher was, helping her learn better classroom management." While it is true, as the court of appeals held that there is no evidence in the record indicating that these three statements were derived directly from data maintained in physical form or storage media and were Hooper's personal commentary, the statements do describe the nature and character of the complaints or charges during the investigation and review and before final disposition of any disciplinary action. The discussion of other problems, lack of formal action, comparative data and working with the teacher are investigatory and dispositional in nature and stem directly from the complaints or charges. Accordingly, we reverse the court of appeals and hold that this was private personnel data, prematurely released and in violation of the MGDPA.

■ The fourth statement that the court of appeals held did not violate the MGDPA was Hooper's statement that, "it's unusual in terms of number of parents calling Dr. Bess and myself." This statement was derived directly from the personnel data contained in Bess's April 18,

1997 letter (stating "This letter is to inform you of concerns expressed by parents") and Hooper's May 28, 1997 letter (stating "We recognize that parents have a legitimate concern about * * * the Communications curriculum"). This statement went beyond "the existence and status of any complaints" by commenting that the number of complaints was "unusual." Therefore, we reverse the court of appeals as to this statement and hold that it violated the MGDPA.

## D. *Hoke's May 30, 1997 press release comments*

■ Hoke's statements in his press release were not presented by respondent in her response to appellant's summary judgment motion or as part of respondent's own summary judgment motion. Instead, these statements were introduced during the trial, where appellant did not object to a copy of the press release being received as evidence. After the evidence portion of the trial was complete, the district court concluded that three different comments in Hoke's press release violated the MGDPA. These comments were: (1) "The allegations are serious enough and substantiated enough that we took the action of suspending the teacher and testing the students;" (2) "We first heard concerns about the situation last fall, when parents called to report that their children were having difficulty learning the communications curriculum. We immediately followed up by investigating these concerns;" and (3) "This spring the concerns shifted from concern about student performance to concern about the teacher's teaching methods. These concerns were investigated by the principal at the time and the investigation continues." The court of appeals held that the district court correctly concluded that Hoke's first statement and the first sentence of his third statement

violated the MGDPA, implicitly holding that Hoke's second statement and the second sentence of his third statement did not violate the MGDPA. *Navarre*, 633 N.W.2d at 52.

Appellant offers no argument as to why Hoke's statement did not violate the MGDPA. Instead, appellant argues that the district court should not have ruled on these statements because they were not brought at summary judgment. Respondent argues that it did not seek summary judgment on Hoke's press release because appellant disputed that it had made releases to the media, making alleged violations arising out of press releases not appropriate for summary judgment because of disputed factual issues. As respondent points out, in appellant's answers to respondent's interrogatories, appellant claimed that it was unaware of any discussions between its employees and members of the media other than "requests that members of the media leave the school premises and statements declining to engage in interviews." This factual dispute adequately explains why Hoke's May 30, 1997 press release was appropriately not a part of respondent's summary judgment motion.

Turning to the content of the press release, it is readily apparent that portions of Hoke's press release violated the MGDPA. Hoke's first statement describes the severity of the complaints, whether they had been substantiated, the action taken against respondent during the investigation, and the basis for such action. The first sentence of Hoke's second statement discloses the nature of the parents' complaints, concerns regarding their children's difficulty in learning the communications curriculum. The first sentence of Hoke's third statement goes on to describe the specific nature of appellant's concerns by expression of its opinion about the shift in concerns rather than merely identifying the existence and status of either the parents' or students' concerns. All of these statements went beyond identifying the existence and status of the complaints and were made before there was a final disposition of any disciplinary action. Therefore, these statements disclosed personnel data on respondent that does not fit any of the public data exceptions under Minn. Stat. § 13.43, subd. 2.

As for the second sentence in Hoke's second statement, it is public personnel data because it goes to the status of the complaints; the complaints were investigated. *See id.*, subd. 2(a)(4). Similarly, the second sentence of Hoke's third statement also disclosed the status of the complaints; the complaints were investigated at the time and the investigation continues. Accordingly, these two statements are public personnel data and do not violate the MGDPA.

*E. Hoke's May 30, 1997 statements to KARE 11 television*

Hoke's statements to *KARE 11* also were not presented as part of respondent's summary judgment motion but were introduced during the trial. Appellant objected to the introduction of the news video transcripts as well as the actual video of the news reports both before trial and during the trial, arguing that they were irrelevant because they had nothing to do with the specific data practices issues before the court. The district court noted these objections but ruled that the news video would be allowed to "paint a picture" for the jury of what happened so that the jury could sort out what damages were attributable to appellant's actions. At the close of evidence, the district court concluded that two statements made during Hoke's interview violated the MGDPA. The court of appeals held that the first statement about respondent not teaching and her

kids not learning violated the MGDPA but that only a portion of the second statement about Bess observing respondent, suspending respondent, and eventually teaching respondent's class himself violated the MGDPA. *Navarre*, 633 N.W.2d at 52–53.

As with Hoke's May 30, 1997 press release, appellant offers no argument as to why the statements made to *KARE 11* did not violate the MGDPA. Rather, appellant's only argument is that this issue was irrelevant because it was not part of the summary judgment motion. Respondent again points out that it did not seek summary judgment for the statements Hoke made to *KARE 11* because appellant had disputed it made any disclosures to the media.

■ Hoke's first statement was "the allegations I've heard were that kids weren't learning." He then answered a question indicating that he believed respondent was not teaching. The court of appeals held that these statements were derived from Bess's April 18 letter or Hoke's May 30 press release and constituted government data. *Navarre*, 633 N.W.2d at 52. We agree and hold that this statement violated the MGDPA by disclosing more than the existence and status of any complaints against respondent by commenting on the specific facts surrounding the complaints and disclosing Hoke's own conclusion about the validity of the complaints before a final disposition of a disciplinary action.

■ Hoke's second statement was "[Bess] would visit with the teacher. He would observe the teacher, and then eventually he started into the classroom to teach for himself. So as he got more and more evidence he was also concerned. By us admitting there was something wrong by suspending the teacher." The court of appeals held that the third sentence of this statement again violated the MGDPA by

disclosing that a determination had been made that there was something wrong and that the teacher had been suspended before there had been a final disposition of a disciplinary action. We agree and affirm the court of appeals that the making of this statement violated the MGDPA. However, the court of appeals found that the first two sentences of Hoke's second statement about visits to respondent's classroom and the resulting increased concerns about respondent's teaching were not based on a physically recorded document or data created or maintained in any physical form. As such, the court of appeals held that these statements did not constitute government data and its release did not violate the MGDPA. *Navarre*, 633 N.W.2d at 52–53. While there appears to be no evidence in the record indicating that these two sentences were derived from recorded data, they do appear to arise directly from the investigation of the complaint or charges. Accordingly, we reverse the court of appeals and hold that these two statements are private personnel data prematurely released before final disposition and are in violation of the MGDPA.

### F. *Palin's July 3, 1997 letter to Monsour*

■ This letter sent to *Pioneer Press* reporter Teresa Monsour by appellant's human resources manager was the second violation the district court found to exist on respondent's summary judgment motion. Specifically, the district court found that Palin's statement that appellant had "received complaints from parents and students alleging concerns involving Ms. Navarre's classroom management and instructional methods" was a violation of the MGDPA. Respondent argues that this statement disclosed more than the existence and status of complaints. The court

of appeals agreed. *Navarre*, 633 N.W.2d at 53.

The first portion of Palin's statement disclosed that appellant had received complaints from parents and students. This information was public data as defined under Minn.Stat. § 13.43, subd. 2(a)(4), because it simply disclosed the existence of complaints and the identity of the complainants in a general manner. *See Demers*, 468 N.W.2d 71, 73 (Minn.1991) (stating "personnel data are data that identify the employee who is the subject of the data"). However, Palin's statement that the complaints involved "Ms. Navarre's classroom management and instructional methods" goes beyond the scope of the public data exception for existence and status, by describing the type of complaint. Therefore, we affirm the court of appeals.

## II.

We next consider appellant's argument that it was justified in releasing all of the personnel data at issue to dispel widespread rumor and unrest. Under the plain meaning of the MGDPA, data collected by political subdivisions "as part of an active investigation undertaken for the purpose of the commencement or defense of *a pending civil legal action,* or which are retained in anticipation of *a pending civil legal action*" are generally classified as "protected nonpublic" or "confidential." Minn.Stat. § 13.39, subd. 2(a) (2000) (emphasis added). As defined by the MGDPA, the term " 'pending civil legal action' includes but is not limited to judicial, administrative or arbitration proceedings." *Id.*, subd. 1 (2000). The chief attorney acting for the political subdivision is charged with determining whether a civil legal action is pending. *Id.* Section 13.39 contains an exception authorizing political subdivisions to make such protected nonpublic or confidential data accessible if it

determines that "the access will * * * dispel widespread rumor or unrest." *Id.*, subd. 2(a).

Here, there is no evidence that the chief attorney for appellant was ever consulted about a civil legal action or that the data disclosed by appellant was collected as part of an active investigation undertaken for the purpose of commencing or defending a pending civil legal action. Therefore, the exception found in section 13.39, subdivision 2(a), does not apply and appellant's argument that it was justified in releasing any personnel data because of this exception is without merit.

## III.

We next consider whether the district court abused its discretion by precluding appellant from presenting evidence of respondent's alleged preexisting emotional problems and reputation and/or erred by denying appellant's motion for a directed verdict on respondent's claim for damages for emotional distress and loss of reputation.

### A. Emotional harm

Citing *Williams v. Trans World Airlines, Inc.*, 660 F.2d 1267, 1272 (8th Cir. 1981), the court of appeals concluded: "In cases involving violation of a statutory right, emotional-distress damages are recoverable absent evidence of verifiable physical injury or severe emotional distress." *Navarre*, 633 N.W.2d at 54. *Williams* involved a racial discrimination claim under Title VII and the Eighth Circuit held that damages are to be presumed where there is an infringement of a substantive constitutional right, thereby not requiring medical testimony. *Williams*, 660 F.2d at 1272. Therefore, the reason for not requiring medical testimony in *Williams* was not because the damages being sought were for a statutory violation

but because the damages were for the violation of a substantive constitutional right, codified by the Civil Rights Act of 1964. No such constitutional right is at issue in this case. Accordingly, we find *Williams* to be neither controlling nor helpful in this case.

The court of appeals also cited to *Gillson v. State Dept. of Natural Res.*, 492 N.W.2d 835, 842 (Minn.App.), *review denied* (Minn. Jan. 28, 1993), and concluded that emotional damages may be awarded based solely on subjective testimony and that a plaintiff need not show that the pain and suffering was severe. *Gillson* is also distinguishable from this case because the damages sought in *Gillson* were for mental anguish under the Minnesota Human Rights Act, which, like Title VII, relates to discriminatory conduct similar to that discussed in *Williams*. *Gillson*, 492 N.W.2d at 841.

 Nevertheless, we recognize that an entity that violates any provision of the MGDPA "is liable to a person * * * who suffers *any damage* as a result of the violation." Minn.Stat. § 13.08, subd. 1 (2000) (emphasis added). We believe this broad language indicates that a plaintiff can recover damages for emotional harm under the MGDPA. However, a plaintiff must still satisfy the standard of proof necessary to recover such damages for emotional harm. Generally,

> [w]e have not been anxious to expand the availability of damages for emotional distress. This reluctance has arisen from the concern that claims of mental anguish may be speculative and so likely to lead to fictitious allegations that there is a potential for abuse of the judicial process. * * * Thus, we have been careful to limit the availability of such damages to "those plaintiffs who prove that emotional injury occurred under

circumstances tending to guarantee its genuineness."

*Lickteig v. Alderson, Ondov, Leonard & Sween, P.A.*, 556 N.W.2d 557, 560 (Minn. 1996) (quoting *Hubbard v. United Press Int'l, Inc.*, 330 N.W.2d 428, 437–38 (Minn. 1983)).

 Here, respondent failed to produce any verifiable medical or psychological evidence to support her claim but did introduce evidence indicating that appellant's disclosure of information made her extremely upset and caused her to be afraid to go out in public. While this evidence was conclusory and not substantiated by any medical testimony, we affirm the court of appeals and hold that the evidence was sufficient to allow respondent's emotional damage claim to be submitted to the jury. However, the district court did not allow any impeachment of this testimony by cross-examination or the introduction of the respondent's prior medical and psychological history. The district court committed error in this regard. We hold that where a plaintiff seeks emotional damages under the MGDPA and puts her emotional state at issue, the defendant should be allowed to introduce probative evidence of the plaintiff's preexisting condition, treatment and prognosis, including expert testimony and/or medical records, that is relevant to the plaintiff's claim for emotional damages. We agree with the court of appeals that it may have been within the district court's discretion to deny an independent medical examination but that the denial appears to have been based in part on respondent's assertion that her existing medical records adequately documented her emotional condition. *Navarre*, 633 N.W.2d at 55. However, these records were not received into evidence, although offered. Accordingly, we affirm the court of appeals and hold that the district court abused its discretion

by not allowing appellant to introduce evidence related to respondent's preexisting emotional problems.

### B. Loss of reputation

Appellant argues that respondent should not have been permitted to submit her loss of reputation claim to the jury because her defamation claim had already been dismissed, making it improper to submit the same claim to the jury for an award of damages disguised as a different cause of action. Alternatively, appellant argues that it should have been allowed to present evidence of respondent's reputation prior to the MGDPA violations. The court of appeals held that the evidence was insufficient to allow respondent's loss of reputation claim to go to the jury and that appellant should have been allowed to present evidence of respondent's reputation prior to the MGDPA violations. *Navarre*, 633 N.W.2d at 55. In doing so, the court implicitly recognized that respondent could ask for loss of reputation damages under the MGDPA even though her defamation action had been dismissed. We have never considered whether loss of reputation damages are recoverable under the MGDPA. The MGDPA does allow recovery for *any damages* sustained and the fact that defamation actions also permit a plaintiff to recover for loss of reputation does not preclude such a claim under the MGDPA so long as there is not a double recovery. *See Kohn v. City of Minneapolis Fire Dep't*, 583 N.W.2d 7, 15 (Minn. App.), *review denied* (Minn. Oct. 20, 1998) (reversing damages award but allowing loss of reputation claim in MHRA action).

While respondent could seek loss of reputation damages, the record contains very little evidence to support such a claim. Respondent testified over hearsay objections that she heard from over 50 people who indicated they were "aware" of the media coverage. She did not testify as to what these people told her and none of these people were called to testify. Respondent's father testified that virtually everyone respondent knew mentioned the *Pioneer Press* article and that he told respondent her attractiveness as a teacher had been destroyed by the media coverage. These conclusory and unsubstantiated statements by respondent and her father are speculative at best and insufficient to support a claim for loss of reputation. *See Kohn*, 583 N.W.2d at 15. Therefore, while respondent could have recovered loss of reputation damages even though her defamation action had been dismissed, the evidence presented was wholly insufficient and speculative. We affirm the court of appeals and hold that the district court abused its discretion in submitting respondent's loss of reputation claim to the jury.

### IV.

Appellant next argues that respondent's claim for lost wages was barred by her failure to pursue arbitration and/or her failure to proceed by writ of certiorari. The court of appeals disagreed, holding that respondent's claim for lost wages was not barred by her failure to pursue arbitration because she was not seeking to recover lost wages under her employment contract. Nonetheless, the court of appeals held that the district court erred as a matter of law by submitting respondent's wage loss claim to the jury. *Navarre*, 633 N.W.2d at 57.

Appellant argues that all matters related to a teacher's employment (including termination issues) are strictly reviewed only by writ of certiorari. However, neither of the cases cited by appellant involved a constructive discharge claim related to MGDPA violations. *See Dokmo v. Indep. Sch. Dist. No. 11*, 459 N.W.2d 671, 673–74 (Minn.1990) (involving the appeal of

a school board decision not to reinstate a teacher); *Dietz v. Dodge Co.*, 487 N.W.2d 237, 239 (Minn.1992) (involving the appeal of the county's decision to terminate nursing home employee). Respondent's claim differs from those in *Dokmo* and *Dietz* because her complaints were not related to the employment contract she had with appellant. Rather, she was seeking to recover lost wages for her alleged constructive discharge that resulted from alleged violations of the MGDPA. Accordingly, we affirm the court of appeals and hold that respondent's lost wages claim was not automatically barred by her failure to pursue arbitration.

■■■■■ Respondent further sought damages for lost wages based on a theory of constructive discharge. "A constructive discharge occurs when an employee resigns in order to escape intolerable working conditions caused by illegal discrimination." *Cont'l Can Co., Inc. v. State*, 297 N.W.2d 241, 251 (Minn.1980). "The intolerable working conditions must have been created by the employer 'with the intention of forcing the employee to quit.'" *Pribil v. Archdiocese of St. Paul and Minneapolis*, 533 N.W.2d 410, 412 (quoting *Johnson v. Bunny Bread Co.*, 646 F.2d 1250, 1256 (8th Cir.1981)); *see also Neid v. Tassie's Bakery*, 219 Minn. 272, 274, 17 N.W.2d 357, 358 (1945) (holding that "[a] discharge presumptively means that the employer no longer needs or desires the employee's services").

■■■■ Here, respondent did not plead constructive discharge or allege that appellant created intolerable working conditions in her complaint. The court of appeals held that even if respondent had properly pleaded constructive discharge, appellant's violations of the MGDPA are inadequate as a matter of law to establish constructive discharge. *Navarre*, 633 N.W.2d at 57. The record supports this holding. There is no evidence that appellant intentionally tried to force respondent to resign, or that it acted with the intention of creating an intolerable working environment for respondent. Instead, the record indicates that appellant offered respondent a teaching position at a school with a principal respondent was familiar with and that appellant was attempting to work with, rather than against, respondent in assuring the next school year was successful. Based on these facts, we affirm the court of appeals and hold that there is no competent evidence tending to support the jury's verdict as to constructive discharge and JNOV for appellant should have been granted.

### V.

■■■■ Finally, appellant argues that it was entitled to JNOV either because of multiple incidences of misconduct by respondent's attorney during closing argument, jury misconduct, or erroneous jury instructions. We have recognized that "judicial restraint bids us to refrain from deciding any issue not essential to the disposition of the particular controversy before us." *Lipka v. Minnesota Sch. Employees Ass'n, Local 1980*, 550 N.W.2d 618, 622 (Minn.1996). Therefore, we need not decide these issues if they are not dispositive to our decision.

Even though there may be some competent evidence reasonably tending to sustain portions of the verdict in this case, the numerous errors committed by the district court mandate a new trial in the interest of justice. Therefore, we need not consider appellant's claims of attorney and jury misconduct.

Affirmed in part, reversed in part, and remanded for a new trial.

MEYER, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.

HANSON, J., not having been a member of this court at the time of the argument and submission, took no part in the consideration or decision of this case.