**Sharon LANGESLAG, Appellant,**

v.

**KYMN INC., a/k/a KYMN Radio, et al., Respondents,**

**Jeff JOHNSON, et al., Defendants.**

**No. C7–02–635.**

Supreme Court of Minnesota.

July 17, 2003.

Richard A. Beens, Eric John Riensche, Ruth S. Marcott, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, MN, for Appellant.

Floyd E. Siefferman, Boris Parker, Saliterman & Saliterman, P.C., for Minneapolis, MN, for Respondents.

OPINION

GILBERT, Justice.

Appellant Sharon Langeslag brought this action against her former employer, KYMN Inc., and Wayne Eddy, the principal owner of KYMN.[1] Eddy brought an intentional infliction of emotional distress counterclaim against Langeslag. After a jury trial, Langeslag moved to dismiss Eddy's counterclaim. The district court denied her motion and submitted the issue to the jury. The jury found that Langeslag intentionally inflicted emotional distress upon Eddy and awarded him $535,000. Langeslag then moved for judgment notwithstanding the verdict (JNOV), a new trial and remittitur. The court denied her motions. The court of appeals affirmed. We reverse.

KYMN is an AM radio station located in Northfield, Minnesota and is principally owned by Wayne Eddy. In August 1996, Eddy hired Sharon Langeslag for an outside sales position. Eddy and Langeslag had a combative and volatile relationship from the beginning. They both admitted that communication between them frequently resulted in heated arguments and shouting matches. Langeslag also frequently threatened to sue Eddy and KYMN and had difficulty working amicably with other KYMN employees.

The incident that gave rise to Langeslag's whistleblower claim occurred in January 1998. Eddy was involved in an incident in KYMN's parking lot that led to his arrest. Langeslag witnessed a part of the incident, and subsequently gave a statement to the police. Felony charges were brought against Eddy and Langeslag testified against Eddy at his criminal trial in

---

1. Langeslag's complaint also included claims against two KYMN employees, which were dismissed in part by Langeslag and in part by the district court.

August 1999. Ultimately, Eddy was convicted of a petty misdemeanor. Eddy testified that he was not aware that Langeslag reported his conduct to police until February 1999.

In April 1998, concerns about Langeslag's ability to work well with other employees and her "general overall attitude" were addressed at KYMN's board meeting. The board minutes of the June 6, 1998 meeting state the following:

> Sharon Langeslag: Continued conflicts with other employees, especially [Eddy]. Threatening and insubordinate; Will not take vacation earned; Reiterate to employees to document all problems with Langslag [sic].

Eddy testified that he ceased having weekly sales meetings because Langeslag's behavior at the meetings was disruptive. In 1997 and again in 1998, Eddy gave Langeslag the opportunity to work from her home and offered to provide the necessary office equipment and supplies. Langeslag refused the offer. However, in January 1999, due to escalating tensions, Langeslag began working from home.

Langeslag brought this action against KYMN and Eddy in June 1999. She alleged breach of contract, violation of Minnesota's whistle-blower statute (Minn. Stat. § 181.932 (2002)), sexual harassment, reprisal, and aiding and abetting in violation of the Minnesota Human Rights Act (MHRA) (Minn.Stat. § 363.03, subd. 1(2), subd. 6 and subd. 7 (2002)), failure to pay wages, assault, intentional interference with contract, retaliation for serving a complaint, violation of Minnesota's equal pay act (Minn.Stat. § 181 .66—181.71 (2002)), wrongful and retaliatory termi-nation, defamation and slander. Eddy counterclaimed, alleging intentional infliction of emotional distress, defamation, and intentional interference with a contractual relationship. On October 28, 1999, Eddy terminated Langeslag, citing her inability to work with other staff members and deficient job performance.

Respondents then moved for summary judgment on all of Langeslag's claims. The district court granted summary judgment on Langeslag's claim of retaliation for serving a complaint, but denied summary judgment on the other claims. Langeslag withdrew her defamation and slander claims. The district court bifurcated the trial: Langeslag's whistle-blower and MHRA claims would be litigated before the judge and the remaining claims would be tried before a jury. The jury trial was held first. At the conclusion of Eddy's case to the jury, Langeslag moved to dismiss Eddy's intentional infliction of emotional distress, interference with a contract, and defamation counterclaims.[2] The district court denied Langeslag's motion and submitted the following issues to the jury: Langeslag's breach of contract claim; and Eddy's defamation, intentional interference with a contractual relationship and intentional infliction of emotional distress counterclaims.[3] The jury returned a special verdict form finding in favor of Eddy on all issues. Specifically, the jury found that KYMN did not breach its employment contract with Langeslag, Langeslag did defame Eddy and/or KYMN Radio, Langeslag did intentionally interfere with KYMN's contractual relationship, and Langeslag did intentionally inflict emotional distress upon Eddy. The

---

**2.** Both parties and the court of appeals refer to this as a motion for directed verdict.

**3.** Langeslag withdrew her common law wrongful termination claim and her equal pay act claim. The district court dismissed her assault and interference with a contract claims.

jury awarded Eddy $535,000 in damages for intentional infliction of emotional distress.[4] Langeslag then filed a motion seeking the alternative relief of JNOV, a new trial, or remittitur on Eddy's three counterclaims, which the court denied.

Next, the district court conducted a bench trial on Langeslag's whistle-blower and MHRA claims. The court found that Eddy did not violate the whistle-blower statute or the MHRA. Langeslag appealed to the court of appeals challenging the district court's denial of her motions regarding Eddy's counterclaims, the district court's conclusion that Eddy did not violate the MHRA or the whistle-blower statute, and two evidentiary issues. The court of appeals affirmed the district court on all counts. *Langeslag v. KYMN,* No. C7–02–635, 2002 WL 31370476, at *8–*9 (Minn. App. Oct.22, 2002). Addressing Eddy's intentional infliction of emotional distress counterclaim the court concluded, "there is evidence to support the jury's finding that appellant intentionally inflicted emotional distress on respondent Eddy." *Id.* at *2.

Langeslag petitioned for review, alleging that the court of appeals erred in concluding that the district court properly submitted Eddy's counterclaims to the jury, and erred in affirming the district court's finding that Eddy did not violate the MHRA and whistle-blower statute. We granted review solely on the issue of whether the district court erred in submitting Eddy's counterclaim for intentional infliction of emotional distress to the jury.

 To determine whether the district court erred in submitting Eddy's intentional infliction of emotional distress counterclaim to the jury, "the same rule is applicable whether the question be raised

by motion for a directed verdict or by motion for [JNOV]." *Dean v. Weisbrod,* 300 Minn. 37, 41, 217 N.W.2d 739, 742 (1974). In considering whether to grant a motion for JNOV, the district court views the evidence in the light most favorable to the nonmoving party and considers "whether the verdict is manifestly against the entire evidence or whether despite the jury's findings of fact the moving party is entitled to judgment as a matter of law." *Navarre v. S. Washington County Sch.,* 652 N.W.2d 9, 21 (Minn.2002). The decision to grant JNOV is a matter of law. Therefore, we review de novo the district court's denial of Langeslag's motion for JNOV. We must affirm the district court if, "in considering the evidence in the record in the light most favorable to the prevailing party, 'there is any competent evidence reasonably tending to sustain the verdict.'" *Id.* (citation omitted).

We first recognized the independent tort of intentional infliction of emotional distress in *Hubbard v. United Press International, Inc.,* 330 N.W.2d 428 (Minn.1983). Intentional infliction of emotional distress consists of four distinct elements:

> (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe.

*Id.* at 438–39; *see also* Restatement (Second) of Torts § 46(1) (1965). We have cautioned that intentional infliction of emotional distress is "sharply limited to cases involving particularly egregious facts" and that a "high threshold standard of proof" is required to submit the claim to a jury. *Hubbard,* 330 N.W.2d at 439. In examining the record, we doubt that Eddy met his burden of production for any of the

---

**4.** The jury also awarded Eddy/KYMN $100,000 in damages for the defamation claim, and $75,000 to KYMN in damages for

the intentional interference of contractual relationship claim.

elements of this tort. However, as in *Hubbard,* we need not consider each element because we conclude the lack of evidence of extreme and outrageous conduct and the lack of a causal connection between the conduct and Eddy's emotional distress dispositive.

## Extreme and Outrageous Conduct

■ Langeslag first argues that she did not engage in extreme and outrageous conduct as defined by this court in *Hubbard.* Conduct is "extreme and outrageous" when it is "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Hubbard,* 330 N.W.2d at 439 (quoting *Haagenson v. National Farmers Union Property and Casualty Co.,* 277 N.W.2d 648, 652 n. 3 (Minn.1979)). Liability for intentional infliction of emotional distress does not extend to "insults, indignities, threats, annoyances, petty oppressions, or other trivialities." Restatement (Second) of Torts § 46 cmt. d (1965). To qualify as extreme and outrageous, the conduct must lead an average member of the community to exclaim "Outrageous!" *Id.*

The court of appeals relied on the following conduct to conclude that the evidence supported the jury's finding that Langeslag's conduct was extreme and outrageous: (1) On two occasions Langeslag made false reports to the police about Eddy; (2) Langeslag repeatedly threatened Eddy with legal action; and (3) Langeslag frequently engaged Eddy in loud workplace arguments. Langeslag argues that as a matter of law this conduct is not extreme and outrageous conduct. We agree.

## 1. False Police Reports

■ In January 1999, Langeslag reported to the police that Eddy was "scalping" Minnesota Vikings tickets. Langeslag testified that KYMN sold Vikings tickets in excess of their value and "claim[ed]" to donate the proceeds to charity.[5] While Eddy admitted to auctioning Vikings tickets over the radio for a price in excess of their face value, he maintained that the proceeds were used for charitable purposes. KYMN had been auctioning items for charity for over 25 years. Langeslag kept the books for these auctions and was aware that the proceeds went to charities. After a brief investigation, the police took no further action.

The second incident took place on January 20, 1999 when Eddy met with Langeslag in his office to ascertain why she had reported him for scalping. Both parties taped the ensuing conversation. Eddy sat behind his desk. Langeslag sat across from him. The office door was located directly behind Langeslag; it was closed but unlocked. During the conversation Langeslag declared that she was afraid of Eddy and stated several times that she wanted to leave the office. Eddy never indicated that Langeslag was not free to leave; but he did request that she stay. Langeslag called 911 and told the police "I need an officer out to the at KYMN Radio station as soon as possible, please. * * * I want to leave and my employer, who's Wayne Eddy, won't let me do that. Yes. I want to leave."

Langeslag admitted that Eddy did not physically prevent her from leaving his office. Nevertheless, she testified that "I really was afraid that I would be hurt, I

5. Langeslag denies initiating contact with the police to report the alleged ticket scalping claiming instead that a police officer approached her about the situation. However, as the district court concluded, police records indicate that Langeslag contacted police to report the alleged ticket scalping.

didn't know what [Eddy] was going to do and as long as I kept * * * talking and asking to leave, I felt I had a chance to get out of this without anything worse happening." Shortly after calling the police, Langeslag left Eddy's office and the KYMN building before the police arrived. The police responded to the 911 call, and listened to the tape of the conversation, but took no further action. It was after this incident that Langeslag began working exclusively from home.

Langeslag argues that neither of these police reports rise to the level of extreme and outrageous conduct because they were not false. The court of appeals concluded that Langeslag knew that the scalping allegations were baseless [6] and that Eddy did not prevent Langeslag from leaving his office. Although the court of appeals thereby determined that both of Langeslag's police reports were false, we need not determine whether Langeslag's police reports were false in our analysis.

 Extreme and outrageous conduct is conduct that is "utterly intolerable to the civilized community." *Hubbard*, 330 N.W.2d at 439 (citation omitted). To prevent fictitious and speculative claims we limit this tort "to cases involving particularly egregious facts." *Id.* Langeslag reported to the police that Eddy was scalping tickets, and that Eddy would not allow her to leave his office. Even assuming these reports were false and Langeslag knew it, this conduct does not rise to the level of outrage that is "utterly intolerable to the civilized community." *Id.* Our conclusion is buttressed by decisions in other jurisdictions reaching similar conclusions. *Fuller v. Local Union No. 106*, 567 N.W.2d 419, 423 (Iowa 1997) (concluding that the defendant did not engage in ex-

treme and outrageous conduct when he falsely reported to the police that the plaintiff was driving while intoxicated); *Holland v. Sebunya*, 759 A.2d 205, 212 (Me.2000) (stating that calling the police and having the plaintiff physically removed from a meeting does not constitute extreme and outrageous behavior, even if the removal was not warranted).

Eddy, however, argues that filing false police reports is analogous to an "attempt to extort money by a threat of arrest," which is conduct the Restatement classifies as extreme and outrageous. *See* Restatement (Second) of Torts § 46 cmt. e (1965). We disagree; Eddy mischaracterizes the Restatement. Under comment e, a police officer's attempt to extort money from a person by threatening arrest is extreme and outrageous conduct because the police officer is in a position of authority over the person. *Id.* Comment e describes a situation where extreme and outrageous conduct arises because the actor is in a position of authority. *Id.* The facts of this case are distinguishable. Eddy, the party claiming emotional distress, as Langeslag's employer was in a position of authority over Langeslag. Langeslag had no authority or power over Eddy. Moreover, there is no evidence supporting the allegations that the police reports were made in an attempt to extort money. Thus, Eddy failed to satisfy the "high threshold standard of proof" for a jury determination of his tort claim. *Hubbard*, 330 N.W.2d at 439. Consequently, the district court erred in submitting this claim to the jury.

## 2. Threats to Take Legal Action

 Eddy testified that beginning in the fall of 1996, when Langeslag was hired,

---

**6.** Minnesota Statutes § 609.805, subd. 2 (2002), provides that whoever intentionally "[s]ells or offers to sell a ticket to an event at a price greater than that charged at the place of admission or printed on the ticket" is guilty of a misdemeanor.

through her tenure at KYMN, she frequently threatened to sue him. He stated that Langeslag made these threats about "anything" and "insignificant things." When asked how he handled these threats, Eddy replied that he attempted to avoid doing anything that could cause Langeslag to initiate a lawsuit. Eddy also testified that fear of a lawsuit prevented him from terminating Langeslag. Although Langeslag denied threatening Eddy with lawsuits, Eddy's apprehension that Langeslag would bring a lawsuit against him was not unfounded as she ultimately brought the lawsuit involved here. KYMN employees testified that Langeslag stated that Eddy would be financially destroyed by her lawsuit and that she knew how to manipulate the court system.

Even viewing the evidence in the light most favorable to Eddy, Langeslag's frequent threats to bring a lawsuit do not qualify as extreme and outrageous conduct. While Langeslag's conduct was unconventional, annoying and may have been intended to harass, threatening to bring a lawsuit in and of itself is not "so atrocious that it passes the boundaries of decency." *Hubbard,* 330 N.W.2d at 439 (citation omitted). In fact, an individual's right to bring a nonfrivolous lawsuit is protected under the Minnesota Constitution. Minn. Const. art. I., § 8. ("Every person is entitled to a certain remedy in the laws for all injuries or wrongs which he may receive to his person, property or character, and to obtain justice freely and without purchase, completely and without denial, promptly and without delay, conformable to the laws."). Eddy is, in effect, asking this court to create a cause of action against those who threaten to bring litigation. However, Langeslag had a constitutionally protected right to peacefully bring a non-

frivolous lawsuit: Action taken to inform Eddy that she intended to do so does not constitute extreme and outrageous behavior.[7] The district court erred in submitting this claim to the jury.

### 3. Workplace Arguments

■■■ Both Langeslag and Eddy admit that they were frequently involved in loud workplace arguments. Eddy testified that Langeslag often used vulgarity and yelled when they disagreed. Langeslag admitted to calling Eddy an "asshole." When asked if she called Eddy this name more than once she replied, "I sure did."

Testimony from several KYMN employees confirms that Langeslag commonly initiated workplace arguments with Eddy. One employee testified that "[Langeslag] called [Eddy] just about every unkind name I could think of. Some of the more common ones, asshole, son of a bitch, bastard, very frequently in his presence." He characterized the relationship between Eddy and Langeslag from 1997 to 1998 as "[v]ery stormy, very combative." He also stated that it was primarily Langeslag who initiated the arguments. Another KYMN employee testified that the arguments "would typically start out with [Eddy] saying something or asking a question of [Langeslag] about an account and, then it would immediately or very quickly turn into a very loud and aggressive shouting match between her and [Eddy] and in all cases I never saw him initiate it. I only saw [Langeslag] initiate it."

Eddy also testified that Langeslag invaded his personal space during their frequent confrontations. A KYMN employee testified that Langeslag was aggressive with Eddy: "[m]any times she would charge into his space and get very, very

---

7. Lawyers and litigants are still bound by rules that prevent frivolous litigation. *See,* *e.g.,* Minn. R. Civ. P. 11.02. and 11 .03; Minn. R. Prof. Conduct 3.1.

close to him and just look right up into his face within inches of each other and shout at him." Another employee testified that "[Langeslag] would go toe to toe. She would step up to [Eddy's] face and yell at him."

Langeslag argues that her conduct was nothing more than occurs in an everyday workplace argument, which we have found not to be extreme and outrageous in *Hubbard* and in *Leaon v. Washington County,* 397 N.W.2d 867 (Minn.1986). In *Hubbard,* we concluded that employment discipline consisting of verbal and written criticism of an employee's job performance, the employer requesting the employee's resignation, and the employer's statement that the employee "chicken[ed] out" of an assignment did not constitute extreme or outrageous behavior. *Hubbard,* 330 N.W.2d at 433, 439. Accordingly, under *Hubbard,* an employer's criticism of an employee's job performance, even if intended to harass, does not constitute extreme and outrageous behavior.

In *Leaon,* a deputy sheriff attended a stag party thrown by his co-workers. *Leaon,* 397 N.W.2d at 869. At the party, events took place that the deputy sheriff felt were inappropriate and caused him distress. He reported the stag party to authorities at work and demanded the names of the people involved. *Id.* The deputy sheriff was subsequently involved in a "verbal altercation" with two of his co-workers. The deputy sheriff maintained that the co-workers threatened him with physical violence. *Id.* He also claimed that his supervisor told him "[y]ou are never going to work in law enforcement again." *Id.* We held, "[a]s a matter of law" these workplace events do not qualify as extreme and outrageous. *Id.* at 873.

*Hubbard* and *Leaon* do not stand for the principle that workplace arguments can never meet the high threshold of proof necessary to establish extreme and outrageous conduct. Those cases were decided under their unique facts. Thus, we must determine whether, under these particular facts, Langeslag's conduct meets the high threshold of proof necessary to sustain an intentional infliction of emotional distress claim.

During a 3–year period, Langeslag frequently shouted at Eddy, used vulgar language and invaded his personal space. This conduct is bizarre, unprofessional, and more than an everyday workplace argument. However, this conduct does not satisfy the high threshold of proof required under *Hubbard* for an intentional infliction of emotional distress claim. Even when considered cumulatively, Langeslag's conduct does not constitute extreme and outrageous conduct "utterly intolerable in a civilized society." *Hubbard,* 330 N.W.2d at 440 (citation omitted). Furthermore, as the employer, Eddy is in the position of power and authority over Langeslag. Eddy could have terminated Langeslag's employment at any time, and thereby put an end to Langeslag's offensive conduct and prevented or mitigated his emotional distress. For over 3 years Eddy acquiesced to Langeslag's behavior. We conclude that under these facts the district court erred in submitting Eddy's workplace argument claim to the jury and permitting the jury to find that Langeslag's behavior was extreme and outrageous.

**Severe Emotional Distress**

▪ Furthermore, we conclude that Eddy has failed to prove he suffered severe emotional distress as a result of Langeslag's conduct. Just as the plaintiff must meet a high threshold of proof in proving the extreme nature of the conduct, the plaintiff must also meet a high threshold of proof regarding the severity of the mental distress. *Hubbard,* 330 N.W.2d at

439. We have adopted the Restatement's definition of severe emotional distress: "The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it." *Hubbard,* 330 N.W.2d at 439. (quoting Restatement (Second) of Torts § 46 cmt. j (1965)). To properly submit an intentional infliction of emotional distress claim to the jury, the emotional distress must be a result of the extreme and outrageous conduct. Restatement (Second) of Torts § 46 cmt. j (1965).

The only evidence introduced during trial supporting Eddy's claim that he suffered severe emotional distress as a result of Langeslag's conduct was Eddy's testimony and his medical records from 1998.[8] The primary evidence of Eddy's emotional distress was his own testimony that he suffered from several physical side effects as a result of his relationship with Langeslag. He began to experience "incessant pain" in his stomach and for the first time he began taking antacids to relieve the pain. Eddy also testified that his relationship with Langeslag triggered alpecial areata, a condition that caused his hair to fall out in clumps. Eddy lost 30 to 40 pounds between 1997 and 2001. The stress caused by his relationship with Langeslag also aggravated his eczema and diabetes. Finally, he testified that he was experiencing impotence. Eddy's physician prescribed an anti-depressant and sleeping pills to help him sleep at night.

The parties stipulated to the admission of Eddy's medical records. The evidence in the medical records connecting Langeslag's conduct to Eddy's physical symptoms of stress, however, is negligible. In March 1998, Eddy completed a "Current Visit Information" form indicating that he was experiencing a "work-related" "unusually stressful situation." A medical record dated March 25, 1998 states that Eddy was under "[h]igh stress recently in his daily activities." A dermatology medical record, dated April 16, 1998 provides that, "In the past month [Eddy] has had a severe flare of his itching rash." The record also states, "He says he is under a lot of stress and wonders if stress may be playing a role in this itching rash."

We conclude that Eddy's medical records fail to establish that Langeslag's conduct caused severe emotional distress in Eddy. In fact, these records are from the spring of 1998, a time shortly after Eddy's arrest in a criminal matter. These symptoms could have been caused by events surrounding the criminal matter just as easily as by Langeslag's conduct. In addition, Eddy's symptoms could not have been a result of the two police reports because Langeslag did not make the reports until 1999. Finally, the medical records reflect that Eddy's eczema, diabetes and impotence were preexisting conditions and there is no evidence establishing that these preexisting conditions were specifically aggravated by Langeslag's conduct. Accordingly, the jury should not have been permitted to find that the conduct caused Eddy's emotional distress.

Eddy's claim involves allegations of complex medical issues and issues of causation, possibly from multiple sources. In such a situation, testimony from the individual making the claim and inconclusive medical records are not sufficient to establish a causal connection between the conduct and the emotional distress. *See Hubbard,* 330 N.W.2d at 440 (holding that depression, high blood pressure, skin rash,

---

**8.** Eddy included two doctors on his witness list, but the district court did not allow the doctors to testify because Eddy did not include them on the witness list in a timely manner as required by the court's discovery deadline.

and stomach disorders did not constitute severe emotional distress when medical evidence of the plaintiff's injuries was missing from the record and that despite the plaintiff's testimony, he never missed work, or saw a doctor because of his problems). The appropriate method of proving the severity and causation of emotional distress is through medical testimony.[9] In addition, other than general allegations of pain and suffering, Eddy failed to submit any probative evidence in support of an award of $535,000 in damages for intentional infliction of emotional distress. The record lacks any evidence of economic damages such as past or future lost wages, lost income, medical expenses, or any similar damage element. For the above reasons, we hold that the district court erred in submitting Eddy's intentional infliction of emotional distress counterclaim to the jury.

Reversed and remanded to the district court for entry of judgment in accordance with this opinion.

---

**9.** Our holding here does not overrule our recent holding in *Navarre,* where we addressed emotional distress damages resulting from a violation of a statutory right. *Navarre,* 652 N.W.2d at 29.