John Joseph WATERS, Jr.,
Plaintiff/Counter–
Defendant,

v.

Gerard Leon CAFESJIAN, G.L.C. Enterprises, Inc., and The Cafesjian Family Foundation, Inc., Defendants/Counter–Claimants/Third–Party Plaintiffs,

v.

Cheri Kuhn Waters a/k/a Cheri Ann Kuhn, Third–Party Defendant.

Civ. No. 12–648 (RHK/LIB).

United States District Court,
D. Minnesota.

May 9, 2013.

John Joseph Waters, Jr., Eden Prairie, Minnesota, Plaintiff pro se.

Erin Sindberg Porter, Andrew M. Luger, Larry D. Espel, Greene Espel PLLP, Minneapolis, Minnesota, for Defendants/Counter–Claimants/Third–Party Plaintiffs.

Cheri Kuhn Waters, Eden Prairie, Minnesota, Third–Party Defendant pro se.

## MEMORANDUM OPINION AND ORDER

RICHARD H. KYLE, District Judge.

### INTRODUCTION

This dispute arises from millions of dollars that Plaintiff John Joseph Waters, Jr. obtained from his longtime employer, Defendant Gerard Leon Cafesjian. Waters commenced this action asserting that the money he received was only part of his agreed compensation and that Cafesjian still owes him millions more; Cafesjian, on the other hand, alleges that Waters embezzled the funds from him and his companies, Defendants G.L.C. Enterprises, Inc. ("GLC") and The Cafesjian Family Foundation, Inc. ("CFF"). Defendants now move for summary judgment on Waters's claims, and for the reasons set forth below, the Court will grant their Motion.

### BACKGROUND

Cafesjian was an executive vice-president of West Publishing when he first met Waters. After retiring from West, he devoted his time and money to advancing causes related to his Armenian heritage.

In pursuit of this goal, he founded GLC and CFF to manage and implement his personal, business, and philanthropic affairs and hired Waters to assist him. Waters worked for Cafesjian for thirteen years, from in 1996 to 2009, when he resigned. Three years after his resignation, Waters commenced the instant action alleging that Defendants owe him millions of dollars in unpaid compensation. Defendants deny Waters's alleged compensation structure and accuse him of embezzling money from Cafesjian.

The parties agree on a few basic facts relating to Waters's employment and compensation. They agree that Waters and Cafesjian entered into an employment agreement in 1996 (the "1996 Agreement") that set his annual compensation at $84,000 plus bonuses up to $36,000, with compensation subject to yearly review. This is the only memorialization of the terms of Waters's employment, including his compensation. They also agree that GLC paid Waters between $30,000 and $310,000 annually in combined salary and bonuses. Apart from these basic facts, however, the parties' stories differ dramatically.

## I. Waters's Contentions

Waters paints Cafesjian as an incredibly secretive, volatile, and paranoid man who ran the family office accordingly. And he paints himself as Cafesjian's loyal, long-suffering assistant, advisor, and confidant. Waters was at Cafesjian's beck and call; he allegedly assisted Cafesjian in everything from investing his millions to concealing his girlfriends. According to Waters, he devoted his life to Cafesjian—working long hours and traveling frequently. Waters alleges that Cafesjian pledged several times to increase his compensation and bonuses, as described below, in order to persuade Waters to remain.

First, in 1999, after a consultant indicated to Cafesjian that Waters was overworked and underpaid, he agreed to tie Waters's compensation to the value of Cafesjian's holdings. The two agreed that Waters would be paid an annual base salary of equal to 20 basis points (or 0.2%) of the value of Cafesjian's holdings, and that he would receive an annual bonus of up to 5 basis points (or 0.05%). They also agreed to defer a portion of his salary and bonuses, which would be paid at the earliest of the following events: Cafesjian's directive; the sale of a significant asset or other liquidity event; Cafesjian's death; or termination of Waters's employment. Utilizing these formulas, Waters accrued approximately $3,875,000 in deferred compensation between 2000 and 2009.

Next, in 2005, Waters asked Cafesjian to pay his deferred compensation early. Cafesjian refused and he also refused to increase Waters's compensation. But when Waters threatened to resign, Cafesjian relented and agreed to give Waters interest-free loans as needed—essentially advances of Waters's deferred compensation. So Waters returned to work, and over the next several years, Cafesjian loaned him a total of $1,807,500: $74,000 in 2005, $516,000 in 2006, $495,000 in 2007, $522,000 in 2008, and $200,000 in 2009.

In 2007, Cafesjian entered into litigation over the Armenian Genocide Museum and Memorial ("AGM & M") that he had contracted to build. As a result of Waters's employment, he was named as a party in the action. In exchange for Waters's cooperation and efforts during the litigation, Cafesjian allegedly promised him "a significant bonus" in the event of a positive outcome. Waters interpreted this to mean he would receive 1–2% of the assets Cafesjian recovered in the litigation, which would be at least $400, 000. Waters worked on the case through 2011, includ-

ing testifying at trial, and Cafesjian eventually prevailed (although the matter is currently on appeal). Waters has yet to receive a bonus or other compensation for his time and effort, although he acknowledges that Cafesjian paid his legal bills.

Finally, in 2008, Cafesjian directed Waters to sell CFF's "program related financial services holdings in the Republic of Armenia." Cafesjian again allegedly promised Waters a "significant bonus" upon completion of the sale. Waters again believed that meant he would receive 1–2% of the proceeds from the sale, which would be at least $150,000. Waters completed the sale as directed, but did not receive a bonus.

All in all, Waters alleges that he is owed over $4 million in deferred compensation, unpaid bonuses, and unused sick and vacation days. GLC kept accounting records of Waters's salary and bonus each year, but there is no record—other than the initial 1996 Agreement—regarding the terms of his employment or compensation structure. Similarly, there is no record of Waters's and Cafesjian's loan agreement, nor records of the loans themselves apart from unannotated withdrawals or transfers from Cafesjian's personal accounts at U.S. Bank.

## II. Defendants' Contentions

Defendants tell a very different story. They deny any deferred compensation or loan agreements and allege, as described below, that Waters created bank accounts using Cafesjian's personal funds and used them to embezzle at least $2.9 million over the course of his employment.

In 2009, after Waters's departure, GLC's new Chief Financial Officer, Gary Jones, discovered two U.S. Bank accounts (the "6934 Account" and the "7856 Account"). Both accounts were in Cafesjian's name, but he could not locate bank records for either at GLC's office—as it turned out, Waters held the bank records for these accounts at his home. The 6934 Account was opened in 1998 with a deposit from one of Cafesjian's personal accounts (the "0512 Account") for which Waters was an authorized signer. In 2004, the 6934 Account was closed and the 7856 Account was opened. Both Accounts listed Cafesjian and Waters as authorized signers and had multiple deposits from the 0512 Account for millions of dollars.

Jones became suspicious of the activity in these accounts, including several transfers to Waters's and his wife's personal accounts and multiple cash withdrawals of less than $10,000, often several days in a row. All the checks written on, deposits to, and withdrawals from the 7856 Account were signed by Waters. The ledger entries for these withdrawals either contained no description or descriptions such as "12/06 purchases," "Cash purchases by GLC," or "Household Unallocated purchases." Defendants hired counsel to look into the matter, who in turn hired private investigator Richard Ostrom.

Ostrom spoke with Waters several times regarding these bank accounts. The first time, in July 2011, Waters indicated he was willing to discuss it under the "right circumstances" because doing so would require him to disclose some sensitive information "that Cafesjian may not want to hear." He discussed various matters with Ostrom, including a bank account for which he had signing authority and from which he withdrew money for Cafesjian. He said he did not take any money for himself. He said that the millions of dollars of cash withdrawals were for the office safe, trips to Armenia, artwork purchases, and passed on to others as grants or wages. (Ex. F, GLC029257.)

The second time Ostrom spoke with Waters, he told Waters that he had questions about money from Cafesjian's account being transferred to Waters's personal account. Ostrom's report stated, "Waters said ... [c]hecks went through his account and he can explain. He described Mr. Cafesjian as a very private and secretive individual. Cafesjian was concerned about the Patriot Act law and that checks must be written under $5,000.00, $7,000.00, ... etc. Waters believes the purpose of what Cafesjian was doing was to perhaps muddy the waters." (Ex. F, GLC029261.) Ostrom also noted, "Waters stated that if Cafesjian thinks he can take action against him ... without anything coming back to ... Cafesjian, he does not realize what he is getting into."

### III. This Litigation

In 2012, Waters commenced this action asserting breach of contract for failure to pay deferred compensation and unused vacation, holiday, and sick days; promissory estoppel for the same and for failure to pay special bonuses after the AGM & M litigation and the CFF-holdings sale; breach of implied contract for failure to indemnify him for his efforts in the AGM & M litigation; and intentional and negligent infliction of emotional distress (against Cafesjian only). Defendants counter-claimed for breach of fiduciary duty, fraud, and constructive trust, and asserted claims against Waters and his wife, Third–Party Defendant Cheri Kuhn Waters, for conversion and civil theft. Defendants now move for summary judgment on Waters's claims against them.

### STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. *Celotex,* 477 U.S. at 322, 106 S.Ct. 2548; *Whisenhunt v. Sw. Bell Tel.,* 573 F.3d 565, 568 (8th Cir.2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. *Weitz Co., LLC v. Lloyd's of London,* 574 F.3d 885, 892 (8th Cir.2009); *Carraher v. Target Corp.,* 503 F.3d 714, 716 (8th Cir. 2007). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Wingate v. Gage Cnty. Sch. Dist.,* No. 34, 528 F.3d 1074, 1078–79 (8th Cir.2008).

### ANALYSIS

### I. Deferred Compensation and Loans

#### A. Breach of Contract

Waters alleges that he and Cafesjian orally agreed to modify his written employment agreement (1) in 1999, tying the amount of his annual salary and bonus to the value of Cafesjian's assets and deferring a portion of both, and (2) in 2005, allowing Waters to take interest-free loans against his deferred compensation. " '[T]he well-established rule in [Minnesota] [is] that a party asserting the parol modification of a written contract has the burden of proving the modification by clear and convincing evidence. The burden is not met by a mere preponderance of the evidence.' If a rational trier of fact could not conclude by clear and convincing evidence that the ... Agreement was mod-

ified ... summary judgment is proper." *Sokol & Assocs., Inc. v. Techsonic Indus., Inc.,* 495 F.3d 605, 610 (8th Cir.2007) (quoting *Merickel v. Erickson Stores Corp.,* 255 Minn. 12, 95 N.W.2d 303, 305 (1959)). The Court concludes that Waters has not met his burden of proof.

Waters has presented virtually no evidence to support his version of the facts. Although he alleges that a few individuals knew of his compensation arrangement, he has not produced statements from any of them. He has not presented a single document that mentions, references, or even tends to support the existence of a deferred compensation or loan agreement—no emails, diary entries, accounting records, or memoranda. Neither he nor Cafesjian ever undertook a valuation of Cafesjian's assets, let alone yearly valuations, which would be required to determine the amount of Waters's alleged compensation. Indeed, Waters acknowledges the amounts he claims as compensation are only estimates. In the Court's view, it appears not only unwise but very unlikely that an employee as sophisticated as Waters would not keep track of the compensation owed to him, especially when the agreement was not in writing. Finally, Waters never requested payment of the *millions* Cafesjian allegedly owed him until bringing this action *three years* after he resigned—an event upon which his deferred salary and bonuses became payable. The only evidence Waters presents to support his version of the facts is his own self-serving affidavit.

Defendants, on the other hand, have produced considerable evidence tending to contradict Waters's account. As Waters acknowledges, he did not disclose any deferred compensation or loans in his divorce decree, his applications for car loans, his applications for mortgages, or his application to sit on the board of a financial institution, all of which required him to list his compensation, assets, and liabilities. He did not mention the deferred compensation or loans to his ex-wife or current wife until commencing this litigation. And there is no mention of either in Cafesjian's will, even though Cafesjian's death is allegedly a payment-triggering event. In fact, the deferred compensation and loans are conspicuously absent from each and every document mentioning Waters's compensation—not only the aforementioned documents he personally filled out, but also from GLC's and Cafesjian's records, including GLC's payroll. Furthermore, Defendants have produced a 2002 memorandum Waters wrote to Cafesjian in which he described compensation tied to the value of Cafesjian's holdings as a "theory" and noted such a compensation structure is more "difficult and complex to implement than one might think."

"[I]n ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 254, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Here, the Court views the evidence presented through the prism of a clear-and-convincing-evidence standard. The Court "must bear in mind the actual quantum and quality of proof necessary to support liability" under that standard and decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 254–55, 106 S.Ct. 2505. The Court is not " 'required to submit a question to a jury merely because *some* evidence has been introduced by the party having the burden of proof.' " *Id.* at 251, 106 S.Ct. 2505 (quoting *Improvement Co. v. Munson,* 81 U.S. (14 Wall.) 442, 448, 20 L.Ed. 867 (1872)) (emphasis added). The question before the Court is "not whether there is literally no evidence, but whether

there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." *Id.* (quoting *Munson,* 81 U.S. at 448, 14 Wall. 442) (italics omitted). Bearing in mind Waters's heightened evidentiary burden and viewing the record as a whole, the Court concludes that Waters has not produced sufficient evidence from which a jury could properly find in his favor. *See Bacon v. Hennepin Cnty. Med. Ctr.,* 550 F.3d 711, 716 (8th Cir.2008) ("A plaintiff may not merely point to unsupported self-serving allegations, but must substantiate allegations with sufficient probative evidence that would permit a finding in the plaintiff's favor.").

### B. Promissory Estoppel

■ Alternatively, Waters seeks to recover his deferred compensation through promissory estoppel. "[Promissory estoppel] requires proof that 1) a clear and definite promise was made, 2) the promisor intended to induce reliance and the promisee in fact relied to his or her detriment, and 3) the promise must be enforced to prevent injustice." *Martens v. Minn. Mining & Mfg. Co.,* 616 N.W.2d 732, 746 (Minn.2000). Waters alleges that Cafesjian promised to compensate him according to the value of Cafesjian's holdings and that he remained in Cafesjian's employ from 2000 through 2009 in reliance on those promises. Regardless of whether Waters has established the other elements, his claim fails for lack of detrimental reliance. Detrimental reliance requires "an actual change in an employee's position," *Krutchen v. Zayo Bandwidth Northeast, LLC,* 591 F.Supp.2d 1002, 1017 (D.Minn. 2008) (Frank, J.), or at least a showing that the employee declined a lucrative opportunity or job offer in reliance on the promise, *Eklund v. Vincent Brass & Aluminum Co.,* 351 N.W.2d 371, 378 (Minn.Ct. App.1984). But Waters alleges neither, only that he continued working for Cafesji-

an as before, maintaining the status quo. Accordingly, his promissory-estoppel claim fails.

### II. AGM & M- and CFF–Related Bonuses

■ Waters also asserts a promissory-estoppel claim to recover his alleged "special bonuses." He states that Cafesjian promised to give him a "significant bonus" for the sale of CFF's financial-services-related holdings and for a successful outcome in the AGM & M litigation, both of which Waters asserts have come to pass. This claim fails for lack of a clear and definite promise. Waters acknowledged in his deposition that his bonuses were discretionary and "completely up to Cafesjian." He also acknowledges that Cafesjian never promised to pay him a specific amount; rather he promised a "significant" bonus each time, and would "throw out numbers" that changed from day to day. Waters interpreted Cafesjian's comments to mean he would receive 1–2% of the assets at issue in the AGM & M litigation and 1–2% of the selling price of the CFF holdings, but he acknowledges that Cafesjian never specifically promised as much, or indeed, any particular amounts. This discretion and lack of specificity are fatal to Waters's claim. *See Martens,* 616 N.W.2d at 746; *T.B. Allen & Assocs. v. Euro–Pro Operating LLC,* Civ. No. 11–3479, 2012 WL 2508021, at *3 (D.Minn. June 28, 2012) (Tunhei m, J.) (alleged oral promise of commissions lacked specific terms and therefore unenforceable); *Fimon v. Kenroc Drywall Supplies, Inc.,* No. C7–02–1588, 2003 WL 1220240, at * 4 (Minn.Ct.App. Mar. 18, 2003) (no clear and definite promise or reasonable reliance where plaintiffs acknowledged it was never certain they would become owners).

### III. Vacation, Holiday, and Sick Days

■ Waters seeks to recover payment for his unused holidays, vacation, and sick

days through multiple claims: breach of contract, promissory estoppel, and statutory violations. However, as Defendants point out, his claims are barred by the statute of limitations under any theory. Minnesota Statutes § 541.07(5) requires claims for wages to be brought within two years. Wages include payment for accrued holiday, vacation, and sick days. *Kohout v. Shakopee Foundry Co.*, 281 Minn. 401, 162 N.W.2d 237, 239–40 (1968). Because Waters resigned in March 2009 but commenced this action three years later in March 2012, his claims are time-barred.

Waters attempts to avoid this result by claiming he continued working for Cafesjian after 2009, ostensibly referring to his involvement in the AGM & M litigation. But he acknowledges that he was a party to the litigation and that he was not paid for his efforts. In the absence of any alleged employment agreement or compensation, the Court cannot conclude that he continued to work for any Defendant after tendering his resignation in 2009. Waters also seeks to avoid the statute of limitations by claiming he demanded payment and was willfully denied, which—if true—would trigger a different, three-year statute of limitations. But he presents no evidence of such a demand and cites only his Complaint to support this assertion. Again, in the absence of any proof, the Court concludes that the two-year statute of limitations applies and Waters's claims are untimely.

## IV. Indemnification

 Waters alleges he incurred over $500,000 of expenses during the AGM & M litigation for which Defendants are required to indemnify him. But assuming for the sake of argument that Defendants have such an obligation, it is not apparent what Defendants could indemnify Waters for—there is no judgment against him

from the litigation and he acknowledges that Cafesjian has paid his legal fees. Instead, it appears that Waters is seeking compensation for his efforts, not his expenses. He states, "From April 1, 2009 through approximately March 31, 2011, I spent not fewer than 2,920 hours on the AGM & M litigation. Because of my extensive efforts in support of the litigation, I have incurred substantial expenses." (Waters Aff. ¶ 14.) The time Waters invested is not an "expense" for which he may be indemnified. *See Phillips v. Investors Diversified Servs., Inc.*, 426 F.Supp. 208, 214 (S.D.N.Y.1976) (director of a corporation who defended himself in litigation was not entitled to indemnification for his time or services). Furthermore, Waters testified under oath at the AGM & M trial that he and Cafesjian had no indemnification agreement, directly contradicting what he alleged in his Complaint. (Waters Aff. Ex. H at 36:7–36:13 ("Q: And so that we're clear, you have an arrangement with Mr. Cafesjian, do you not, that he will indemnify you for any losses sustained as a result of this litigation, correct? A: Not to the best of my knowledge. Q: You don't have an indemnity agreement with Mr. Cafesjian? A: No.").)

## V. Emotional Distress

Waters alleges that Cafesjian intentionally or negligently caused him emotional distress by: terminating contracts with firms he deemed "friendly" to Waters, threatening litigation against business partners deemed "friendly" to Waters, disseminating false or misleading information about Waters, claiming to have Waters's phone tapped, threatening persons planning to attend Waters's wedding, having Waters investigated, and presenting unfounded claims about Waters to the FBI.

 The Court has serious doubts whether the alleged conduct meets the

requirements of either negligent or intentional infliction of emotional distress. *See Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 865 (Minn.2003) ("Liability for intentional infliction of emotional distress does not extend to insults, indignities, threats, annoyances, petty oppressions, or other trivialities.") (internal quotation omitted); *Soucek v. Banham*, 503 N.W.2d 153, 164 (Minn.Ct.App.1993) ("In an action for negligent infliction of emotional distress, the plaintiff must show that he was within the 'zone of danger,' and reasonably feared for his safety. However, an exception to the 'zone of danger' rule is available if the plaintiff can show 'a direct invasion of his rights, such as defamation, malicious prosecution, or other willful, wanton or malicious conduct.'") (internal citation omitted). But putting such doubts aside, Waters's claims fail because he has not shown he suffered severe emotional distress as a result of Cafesjian's conduct. Under Minnesota law, Waters is required to present some evidence, other than his own testimony, to establish that the challenged conduct caused his emotional distress. *See Langeslag*, 664 N.W.2d at 870 ("The appropriate method of proving ... emotional distress is through medical testimony."); *Deli v. Univ. of Minn.*, 578 N.W.2d 779, 783 (Minn.Ct.App.1998) ("[T]he testimony provided by [the plaintiff] to support her emotional distress claim consisted solely of her own testimony regarding her mental state and the testimony of three colleagues who based their conclusions on phone calls and personal observations. In the absence of any medical testimony, such testimony fails to provide the 'guarantees of trustworthiness' necessary to overcome the speculative nature of this claim because we cannot be certain of the extent of her distress and can only speculate as to its source."). Because Waters has presented no supporting evidence or testimony other than his own affidavit, both of his emotional-distress claims fail.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. 44) is **GRANTED** and the Complaint (Doc. No. 1) is **DISMISSED WITH PREJUDICE.**[1]

---

**1.** Upon dismissal of Waters's claims, only Defendants' counter-claims against Waters and Defendants' claims against his wife, Third–Party Defendant Cheri Kuhn Waters, remain pending.