*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1403**

Anthony Patrick Huber,
Appellant,

vs.

Jason R. Vohnoutka, et al.,
Respondents,

Darlene Heimerl, et al.,
Defendants.

**Filed April 6, 2015
Reversed and remanded
Johnson, Judge**

Anoka County District Court
File No. 02-CV-13-3735

Steven E. Uhr, Eden Prairie, Minnesota (for appellant)

James S. Reece, Wynne C.S. Reece, Reece Law, LLC, Minneapolis, Minnesota; and

Michael G. Patiuk, Thompson Coe Cousins and Irons, LLP, St. Paul, Minnesota (for respondent)

Considered and decided by Halbrooks, Presiding Judge; Johnson, Judge; and Larkin, Judge.

UNPUBLISHED OPINION

**JOHNSON**, Judge

Anthony Patrick Huber commenced this action to obtain a remedy for his therapist's release of records of his psychotherapy sessions. Huber alleged multiple claims, including a claim under the Minnesota Health Records Act against an attorney who requested and obtained the records from the therapist, on the ground that the attorney obtained the records under false pretenses. The district court granted summary judgment to the attorney on that claim, reasoning that the attorney did not mislead the therapist when he obtained Huber's health records by mailing a subpoena *duces tecum* to the therapist and by referring to a consent form in which Huber had authorized his therapist to release his health records to a different person. We conclude that there is a genuine issue of material fact as to whether the attorney obtained Huber's health records under false pretenses. Therefore, we reverse and remand.

## FACTS

In 2009, Huber was a party to a child-custody proceeding commenced by a woman with whom Huber had had a child. The woman petitioned the Anoka County District Court for an award of sole legal custody and sole physical custody of the child, who then was two years old. In his response, Huber, through counsel, sought an award of joint legal custody. In February 2009, the district court in the custody case ordered a custody evaluation and appointed Marcia Young, a family-court evaluator with the Anoka County Domestic Relations Unit, to conduct the evaluation before a hearing on the mother's petition.

2

On February 11, 2009, Huber signed a document, entitled "Consent for Release and Exchange of Confidential Information," which appears to be a form developed by the Anoka County Domestic Relations Unit. The key language of the consent form states:

> I give my permission and request that the following information be released for the purpose of a custody or parenting time evaluation, mediation or resolution counseling or other assessment purposes.
>
> I hereby authorize you to disclose to Marcia Young the information requested below. I also give my permission for the above staff person to exchange information with you.

The consent form also states, "I understand this release is valid only for the following information: . . . mental health counseling/therapy records, including psychological testing."

On February 18, 2009, Young wrote to Huber's psychotherapist, Darlene Heimerl, and requested "a summary letter of [Huber's] work in therapy with you, including client's presenting problem, progress, and prognosis." Young added, "If you prefer, send me copies of your progress notes." Young enclosed a copy of Huber's signed consent form. Heimerl did not respond to Young's request. Young prepared her custody evaluation without Huber's mental-health records or any input from Heimerl. In April 2009, Young recommended that the child's mother be awarded sole legal custody because the parents had difficulty communicating and the child otherwise "would be caught in a war zone."

In September 2009, the child's mother retained Jason R. Vohnoutka, an attorney, to represent her in the upcoming custody hearing, which then was scheduled for October 2009. Vohnoutka reviewed the previous attorney's file, which included a copy of

Huber's signed consent form. On September 22, 2009, Vohnoutka sent a letter to Heimerl concerning Huber's mental-health records. The body of Vohnoutka's letter states as follows:

> The undersigned has been substituted as counsel for Petitioner in the above-captioned matter in the place and stead of James Gerharter, Esq. Accordingly, enclosed please find a copy of the substitution of counsel.
>
> Your patient Anthony Huber is a party to the above-captioned custody case. You were previously requested by Marcia Young, the Custody Evaluator in this case, to provide counseling records relative to Mr. Huber's sessions. Mr. Huber executed an Authorization for release of that information. To date no information has been received from you. The matter is scheduled for trial on October 8, 2009, and review of those records is necessary prior to that trial.
>
> Accordingly, enclosed and served upon you by mail, please find a Subpoena to produce documents. In lieu of producing Mr. Huber's counseling records at my office, you may produce certified copies of those same and forward them to my office via mail. You are entitled to reasonable compensation for your time and expense involved in producing those documents. Please determine the amount of those expenses and inform me of such and those reasonable expenses will be paid immediately.
>
> Please telephone me if you have any questions or concerns or wish to discuss this.

The enclosed subpoena states that Heimerl is "commanded to produce and permit inspection and copying of . . . [a]ny and all records in your possession regarding Anthony Huber," at Vohnoutka's office, on September 30, 2009, at 1:00 p.m. The letter indicates that Vohnoutka's client, but no one else, received a copy of the letter. On September 23,

4

2009, Heimerl released Huber's mental-health records to Vohnoutka by faxing 46 pages of notes of Huber's psychotherapy sessions, beginning in January 2008.

The evidentiary hearing in the Anoka County District Court eventually occurred in February 2010. Huber learned that Vohnoutka had obtained his mental-health records when Vohnoutka attempted to introduce the records into evidence. Huber objected. The district court sustained the objection and refused to admit the records into evidence because of a lack of foundation, noting that Heimerl was not present to testify.

In May 2010, the district court issued a 20-page order and memorandum in which it awarded sole legal custody and sole physical custody of the child to his mother. The district court granted parenting time to Huber on some weekday evenings and on alternating weekends. The district court's decision was based primarily on the "inability to communicate and co-parent" of Huber and the child's mother. Specifically, the district court found that Huber had harassed his child's daycare and medical providers, which had "a negative impact on the minor child" and affected the child's stability. When analyzing the parents' respective mental health, as required by statute, *see* Minn. Stat. § 518.17, subd. 1(9) (2014), the district court noted that it "did not receive evidence to suggest [Huber] is not of good mental and physical health."

In April 2013, Huber commenced this action against Vohnoutka and Heimerl, alleging an unlawful release of his mental-health records. His four-count complaint alleged (1) a claim of fraudulent misrepresentation against Vohnoutka, (2) a claim of intentional infliction of emotional distress against Vohnoutka, (3) a claim of negligence

against Heimerl, and (4) a claim of a violation of the Minnesota Health Records Act against Heimerl and Vohnoutka.

In February 2014, the parties filed cross-motions for summary judgment. Huber moved for summary judgment on his third and fourth claims; Vohnoutka and Heimerl moved for summary judgment on all claims. In June 2014, the district court denied Huber's motion and granted Heimerl's and Vohnoutka's motions. In analyzing Huber's claim against Vohnoutka under the Minnesota Health Records Act, the district court reasoned that, as a matter of law, Vohnoutka did not use false pretenses because Huber did not submit any evidence that Vohnoutka intended to deceive Heimerl.

Huber appeals from the district court's judgment in favor of Vohnoutka, but only with respect to his fourth claim, which alleges a violation of the Minnesota Health Records Act. Huber's counsel represents that Huber and Heimerl have voluntarily resolved his claims against her.

## D E C I S I O N

Huber argues that the district court erred by granting Vohnoutka's motion for summary judgment on Huber's claim that Vohnoutka obtained his mental-health records under false pretenses in violation of the Minnesota Health Records Act.

A district court must grant a motion for summary judgment if the evidence demonstrates "that there is no genuine issue as to any material fact and that either party is entitled to a judgment as a matter of law." Minn. R. Civ. P. 56.03. A genuine issue of material fact exists if a rational trier of fact, considering the record as a whole, could find for the non-moving party. *Frieler v. Carlson Mktg. Grp., Inc.*, 751 N.W.2d 558, 564

(Minn. 2008).  This court applies a *de novo* standard of review to the district court's legal conclusions on summary judgment and views the evidence in the light most favorable to the non-moving party.  *RAM Mut. Ins. Co. v. Rohde*, 820 N.W.2d 1, 6 (Minn. 2012); *Day Masonry v. Independent Sch. Dist. 347*, 781 N.W.2d 321, 325 (Minn. 2010).

The Minnesota Health Records Act governs the release of patients' health-related records by health-care providers.  *See* Minn. Stat. § 144.293, subd. 1 (2014).  At the crux of the statute is the following rule of proscription:

> A provider, or a person who receives health records from a provider, may not release a patient's health records to a person without:
>
> (1)  a signed and dated consent from the patient or the patient's legally authorized representative authorizing the release;
>
> (2)  specific authorization in law; or
>
> (3)  a representation from a provider that holds a signed and dated consent from the patient authorizing the release.

Minn. Stat. § 144.293, subd. 2.  The legislature has expressly authorized a cause of action for a violation of section 144.293, subdivision 2:

> A person who does any of the following is liable to the patient for compensatory damages caused by an unauthorized release or an intentional, unauthorized access, plus costs and reasonable attorney fees:
>
> (1)  negligently or intentionally requests or releases a health record in violation of sections 144.291 to 144.297;
>
> (2)  forges a signature on a consent form or materially alters the consent form of another person without the person's consent;

7

(3)     obtains a consent form or the health records of another person under false pretenses; or

(4)     intentionally violates sections 144.291 to 144.297 by intentionally accessing a record locator service without authorization.

Minn. Stat. § 144.298, subd. 2 (2014); *see also Larson v. Northwestern Mut. Life Ins. Co.*, 855 N.W.2d 293, 301-02 (Minn. 2014).

In this case, Huber argues that Vohnoutka should be held liable under the third paragraph of section 144.298, subdivision 2, on the ground that Vohnoutka obtained his mental-health records under false pretenses.  In response, Vohnoutka makes three arguments: (1) he did not use false pretenses when seeking to obtain Huber's mental-health records; (2) in the alternative, he did not obtain Huber's mental-health records because of any false pretenses; and (3) again in the alternative, Huber is not entitled to an award of compensatory damages because he failed to submit sufficient evidence of a compensable injury.

Before analyzing the parties' respective arguments, we note that Vohnoutka does *not* argue on appeal that the release of Huber's mental-health records was not an "unauthorized" release. *See* Minn. Stat. § 144.293, subd. 2.  Vohnoutka merely hints that he did not use false pretenses because he did not mislead Heimerl when he sent her a letter explaining that Huber had signed a consent form authorizing the release of his mental-health records.  He asserts that both he and Heimerl believed that Huber had consented to Heimerl's release of records to Vohnoutka, which might be read to suggest that the release was authorized by Huber's signed consent form.  Vohnoutka also hints

8

that he did not use false pretenses because he sent Heimerl a subpoena *duces tecum*. He asserts that the subpoena *duces tecum* is valid despite certain procedural irregularities, which might be read to suggest that the release was authorized by the subpoena *duces tecum*. But Vohnoutka does not expressly argue that either of these suggestions is a reason why the district court properly granted his summary-judgment motion. For the sake of clarity, we will review the reasons why Heimerl's release of Huber's mental-health records to Vohnoutka was not authorized by either Huber's signed consent form or by the subpoena *duces tecum*.

First, a provider is authorized to release a patient's health records if there is "a signed and dated consent from the patient or the patient's legally authorized representative authorizing the release." Minn. Stat. § 144.293, subd. 2(1). Huber signed a consent form that authorized Heimerl to disclose his records to Young "for the purpose of a custody or parenting time evaluation, mediation or resolution counseling or other assessment purposes." By its plain language, the consent form did not authorize Heimerl to release Huber's mental-health records to anyone other than Young or for any other purpose than the purposes stated. In other words, the consent form did not authorize Heimerl to release Huber's mental-health records to Vohnoutka for purposes of trial. Thus, the consent form that Huber signed on February 11, 2009, did not authorize "the release" of records by Heimerl on September 23, 2009. *See* Minn. Stat. § 144.293, subd. 2(1).

Second, a provider is authorized to release a patient's health records if there is "specific authorization in law." Minn. Stat. § 144.293, subd. 2(2). Vohnoutka prepared a

9

subpoena *duces tecum* and sent it by mail to Heimerl with his September 22, 2009 letter. But Vohnoutka did not serve the subpoena *duces tecum* on Heimerl and did not give notice to Huber or his attorney. Vohnoutka suggests that the subpoena *duces tecum* was valid and enforceable despite a lack of proper service because Heimerl did not object to receiving the subpoena *duces tecum* by mail. But the rules of civil procedure clearly require personal service. A subpoena commanding production of documents "must be served on the subject of the subpoena," and a party must do so "by delivering a copy thereof to such person or by leaving a copy at the person's usual place of abode with some person of suitable age and discretion then residing therein." Minn. R. Civ. P. 45.02(a). Thus, if a subpoena is delivered by mail instead of personal service, the subpoena is not valid and not enforceable and, thus, does not impose an obligation on the non-party to respond. *See id.*; *see also Smith v. Midland Brake, Inc.*, 162 F.R.D. 683, 686 (D. Kan. 1995) (denying motion to compel compliance with subpoena that was invalid because of improper service).

Vohnoutka also suggests that the subpoena *duces tecum* was valid and enforceable despite his failure to give notice to Huber. Again, the rules of civil procedure are clear. Notice of a production of documents pursuant to a subpoena *duces tecum* "must be served . . . on each party to the action, at least seven days before the required production." Minn. R. Civ. P. 45.02(a). In 2007, the rules were amended to make clear that "[a]ny use of a subpoena, other than to compel attendance at a trial, without prior notice to all parties to the action, is improper and may subject the party or attorney issuing it, or on whose behalf it was issued, to sanctions." Minn. R. Civ. P. 45.01(e); Minn. R. Civ. P. 45, 2007

10

advisory committee comment, ¶ 2; *see also Sandberg v. Commissioner of Revenue*, 383 N.W.2d 277, 280-82 (Minn. 1986) (disapproving of state's "improper" use of *ex parte* subpoena *duces tecum* but declining to reverse because taxpayer was not prejudiced by lack of notice).[1]

The Minnesota Health Records Act authorizes a release of health records in only three circumstances. *See* Minn. Stat. § 144.293, subd. 2. Heimerl's release of Huber's mental-health records was not authorized in the first way because Huber's consent form was limited in scope. *See id.*, subd. 2(1). Heimerl's release was not authorized in the second way because the subpoena *duces tecum* that Vohnoutka prepared and mailed was invalid and unenforceable.[2] *See id.*, subd. 2(2). Heimerl's release was not authorized

---

[1]In 2010, the rules were amended again to prevent the "misuse" of a subpoena, including the use of a subpoena without notice to an opposing party. The advisory committee stated that "notice of issuance of a subpoena is required in order that all parties have an opportunity to participate in the production and to curtail use of a subpoena for ex parte investigation." Minn. R. Civ. P. 45, 2010 advisory committee comment, ¶ 1. A new provision was added to require the party issuing a subpoena *duces tecum* to "make available to all parties" any documents or other things produced pursuant to the subpoena *duces tecum*, to require the party serving the subpoena *duces tecum* to give all parties seven days' notice if the time or place of a production of documents is changed from what is shown on the face of the subpoena, and to give all parties a right to "attend and participate in any noticed or rescheduled production or inspection" pursuant to the subpoena *duces tecum*. Minn. R. Civ. P. 45.04(a)(5); *see also* Minn. R. Civ. P. 45, 2010 advisory committee comment, ¶ 2. The 2010 amendments, however, did not become effective until July 1, 2010, after Vohnoutka obtained Huber's mental-health records.

[2]Because the subpoena *duces tecum* in this case is invalid and unenforceable because it was not properly served on Heimerl, we need not consider or decide whether a valid subpoena *duces tecum* would constitute "specific authorization in law" for the release of health records. *See* Minn. Stat. § 144.293, subd. 2(2). Health records typically contain information that is protected by a medical privilege. *See* Minn. Stat. § 595.02, subd. 1(d), (g) (2014). The privilege "belongs to the patient" and, thus, "may be waived only by the patient." *Wenninger v. Muesing*, 307 Minn. 405, 407, 240 N.W.2d 333, 335

11

according to the third method because Vohnoutka was not a provider. *See id.*, subd. 2(3); Minn. Stat. § 144.291, subd. 2(h) (2014) (defining "provider"). Therefore, Heimerl's release of Huber's mental-health records was unauthorized.

## A.    Use of False Pretenses

We turn to Huber's main argument, and Vohnoutka's first counterargument, which concerns the question whether Vohnoutka "obtain[ed] . . . the health records . . . under false pretenses." *See* Minn. Stat. § 144.298, subd. 2(3).

The Minnesota Health Records Act defines ten words or terms but does not define the term "false pretenses." *See* Minn. Stat. § 144.291. The appellate courts have not

---

(1976), *superseded by statute on other grounds*, Minn. Stat. § 595.02, subd. 5 (2014). A person waives the medical privilege if he or she "voluntarily places in controversy" his or her physical or mental health in the course of a pending civil action. Minn. R. Civ. P. 35.03. If a person has waived the medical privilege pursuant to rule 35.03, the disclosure of the patient's health records is governed by rule 35.04, which provides a means for the disclosure of medical records "as to which privilege has been waived." Minn. R. Civ. P. 35.04(b). In that event, it appears that rule 35.04 is "the exclusive means" of conducting discovery into the medical issues for which the privilege has been waived. *See Wenninger*, 307 Minn. at 412, 240 N.W.2d at 337. In that context, an attorney's disclosure of health records to a rule 35 examiner is specifically authorized by law and, thus, permitted by the Minnesota Health Records Act. *Newman v. Brendel & Zinn, Ltd.*, 691 N.W.2d 480, 483 (Minn. App. 2005), *review denied* (Minn. Mar. 29, 2005). Rule 35 applies in a child-custody proceeding to govern the disclosure of mental-health records, at least with respect to the petitioning party's mental-health records. *See Morey v. Peppin*, 353 N.W.2d 179, 183 (Minn. App. 1984), *rev'd on other grounds*, 375 N.W.2d 19 (Minn. 1985). If rule 35.03 applies, an attorney should obtain medical records pursuant to rule 35.04, which allows the district court to supervise the discovery process and to "use its protective authority to prevent disclosures that are irrelevant to the custody question or otherwise annoying, embarrassing, oppressive, or unduly burdensome." *Morey*, 353 N.W.2d at 183 (citing Minn. R. Civ. P. 26.03). Thus, if rule 35 applies, it appears that an attorney should not seek to obtain medical records pursuant to rule 45. *See Wenninger*, 307 Minn. at 412, 240 N.W.2d at 337. Similarly, in a criminal case, an attorney should seek to obtain medical records of a victim only pursuant to a court order. *See* Minn. R. Crim. P. 22.01, subd. 2.

interpreted the term as it is used in the Minnesota Health Records Act. The district court reasoned that the term "false pretenses," in this context, "includes the element of intent to deceive or defraud." On appeal, Huber appears to contend that "false pretenses" requires an intent to deceive, but he cites no authority for such a requirement. Vohnoutka offers a slightly different meaning for the term and cites two authorities from which a working definition might be derived. First, he notes that, at common law, "false pretenses" was the label of a criminal offense for "knowingly obtaining title to another's personal property by misrepresenting a fact with the intent to defraud." *See Black's Law Dictionary* 678 (9th ed. 2009). Second, he notes that a statute criminalizing identify theft defines the term "false pretenses" to mean, in part, "any false, fictitious, misleading, or fraudulent information or pretense or pretext." *See* Minn. Stat. § 609.527, subd. 1(c) (2014). Absent a definition of "false pretenses" within the Minnesota Health Records Act, we will rely on the legislature's definition of the same term within the identity-theft statute, which seems to incorporate the common-law definition. *See Dayton Hudson Corp. v. Johnson*, 528 N.W.2d 260, 262 (Minn. App. 1995) (borrowing definition from another statute to interpret undefined statutory term). Thus, we will analyze the evidence to determine whether Vohnoutka used any false, fictitious, misleading, or fraudulent information or pretense or pretext as a means of inducing Heimerl to release Huber's mental-health records.

The district court concluded that Vohnoutka was entitled to summary judgment because Huber "failed to produce evidence that Mr. Vohnoutka intended to deceive Ms. Heimerl." Huber argues that the district court erred because "[t]he record contains

13

substantial circumstantial evidence that Mr. Vohnoutka intended to deceive Ms. Heimerl into believing that" she was authorized or required to release Huber's mental-health records to Vohnoutka. Huber focuses on Vohnoutka's written correspondence to Heimerl and contends that a fact-finder reasonably could draw inferences that would allow the conclusion that Vohnoutka used false pretenses to obtain Huber's mental-health records.

More specifically, Huber contends that the circumstantial evidence in the summary-judgment record is sufficient to prove that Vohnoutka intended to deceive Heimerl into believing that Huber had consented to her release of the records to Vohnoutka. The language that Vohnoutka used in his September 22, 2009 letter supports Huber's contention. The letter stated that Huber is a party to a pending child-custody case, that Heimerl had been "previously requested . . . to provide counseling records" relating to Huber, that Huber had "executed an Authorization for release of that information," that Heimerl had not yet released any records, that trial was scheduled for the near future, and that "review of those records is necessary prior to that trial." A reasonable fact-finder could rely on these statements in the letter as the basis of a finding that Vohnoutka wanted Heimerl to believe that Huber had consented to the release that Vohnoutka was requesting, even though Huber had not done so. Vohnoutka contends that he did not mislead Heimerl because both he and Heimerl believed that Huber's signed consent form allowed Heimerl to release records to Vohnoutka. Vohnoutka's contention would require a fact-finder to conclude that he, an attorney, had an inaccurate understanding of the law and the consent form.

14

Huber also contends that the circumstantial evidence in the summary-judgment record is sufficient to prove that Vohnoutka intended to deceive Heimerl into believing that she was obligated to release Huber's mental-health records because of the subpoena *duces tecum*. Again, the language of Vohnoutka's September 22, 2009 letter supports Huber's contention. After stating the information recited above, the letter states, "Accordingly, enclosed and served upon you by mail, please find a Subpoena to produce documents." Huber notes that, by stating that Heimerl had been "served," the letter implied that Heimerl was obligated by law to respond. Huber also notes that the subpoena *duces tecum* included a stern warning that Heimerl could be found in contempt of court for "failure to obey" the subpoena. Huber points out that the scope of the documents described in the subpoena *duces tecum* is broader than the records described in the consent form to which the letter referred. Huber also points out that Vohnoutka did not give him notice of the subpoena. Huber contends that the circumstances indicate that Vohnoutka was aware of the defects in his use of the subpoena but wished to conceal them from Huber and his attorney. Indeed, Vohnoutka's failure to notify Huber of the subpoena *duces tecum* denied Huber the opportunity to object and seek a protective order to prevent disclosure of the privileged information. *See* Minn. R. Civ. P. 45.03(c)(1)(C).

Huber contends that Vohnoutka used false pretenses even if each of the statements in his letter could be understood as true, if read literally and in isolation from the context. Huber cites caselaw for the proposition that, "even if one has no duty to disclose a particular fact, if one chooses to speak he must say enough to prevent the words from misleading the other party." *M.H. v. Caritas Family Servs.*, 488 N.W.2d 282, 288 (Minn.

15

1992) (holding that plaintiff's evidence was sufficient to defeat defendant's summary-judgment motion on plaintiff's claim of negligent misrepresentation). In addition, a person may commit fraud by nondisclosure if the person suppressed facts of which he was "under a legal or equitable obligation to communicate to the other, and which the other party is entitled to have communicated to him." *Richfield Bank & Trust Co. v. Sjogren*, 309 Minn. 362, 365, 244 N.W.2d 648, 650 (1976). A person may have a duty to communicate material facts if necessary "to prevent his words from misleading the other party" or if he "has special knowledge of material facts to which the other party does not have access." *Id.* at 366, 244 N.W.2d at 650 (quotations omitted). These principles might be helpful in a different case. But it is unnecessary to apply them in this case because the parties have identified a working definition of the term "false pretenses."

We conclude that the evidence in the summary-judgment record is sufficient to allow a reasonable fact-finder to find that Vohnoutka used false pretenses when he sent the letter and subpoena *duces tecum* to Heimerl on September 22, 2009. Thus, the district court erred by granting Vohnoutka's motion for summary judgment on the ground that Huber failed to produce sufficient evidence that Vohnoutka used false pretenses.

## B. Causation

We next turn briefly to Vohnoutka's second counterargument, which is asserted in the alternative to his first counterargument. Vohnoutka contends that he may not be held liable because, even if he used false pretenses, his false pretenses did not cause Heimerl to release Huber's mental-health records. Vohnoutka did not present this argument to the district court. A party may not make an argument for the first time on appeal and thereby

16

seek appellate relief on an issue that was not litigated in the district court. *See, e.g.*, *Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988). "[T]he preservation requirement prevents litigants from suffering unfair surprise at the appellate level if they had no opportunity to address the issue in the district court" and "avoids frequent remands for additional evidence gathering and findings, serves the need for finality in litigation and conservation of judicial resources, and prevents appellate courts from frequently holding everything accomplished below for naught." *Doe 175 ex rel. Doe 175 v. Columbia Heights Sch. Dist.*, 842 N.W.2d 38, 43 n.1 (Minn. App. 2014) (quotations omitted). Because Vohnoutka did not present a causation argument to the district court, we will not consider the argument on appeal.

## C. Evidence of Compensable Injury

We last turn to Vohnoutka's third counterargument, which is asserted in the alternative to his first and second counterarguments. Vohnoutka contends that this court should affirm the district court on alternative grounds. Specifically, he contends that Huber cannot establish his claim because he did not submit evidence of an injury that justifies an award of compensatory damages. Vohnoutka preserved this argument by presenting it to the district court in his summary-judgment memorandum. The district court did not analyze this argument with respect to Huber's claim under the Minnesota Health Records Act, although the district court analyzed a similar argument with respect to Huber's negligence claim. Because Vohnoutka presented the argument to the district court, he may re-assert the argument on appeal as an alternative ground for affirmance of the district court's decision. *See Day Masonry*, 781 N.W.2d at 331.

17

Vohnoutka contends that Huber did not present evidence of a compensable injury because Huber "didn't specify any damages that he suffered from respondent having his counseling records." In response, Huber contends that he sustained two types of injuries. First, Huber contends that Vohnoutka's possession of his mental-health records put him at a disadvantage in the child-custody proceeding. Second, Huber contends that he experienced "mental anguish."

With respect to Huber's first contention, the Anoka County District Court awarded sole legal custody and sole physical custody to the child's mother based on its finding that Huber and the child's mother could not effectively communicate with each other. Huber's mental-health records were not admitted into evidence, and the ultimate decision on custody indicates that Huber's mental health was not a factor in the decision. Huber has not identified any other way in which Vohnoutka's possession of his mental-health records had an impact on the child-custody proceedings. It appears that Huber's contention is merely conjectural. "Damages which are remote and speculative cannot be recovered." *Jackson v. Reiling*, 311 Minn. 562, 563, 249 N.W.2d 896, 897 (1977).

With respect to Huber's second contention,[3] Huber's evidence is contained in his own affidavit, in which he states that he has suffered "severe emotional distress that continues to this day" and continues to suffer "stress, anxiety, depression, sleeplessness,

---

[3]We assume without deciding that the Minnesota Health Records Act authorizes an award of compensatory damages for a plaintiff's emotional distress or mental anguish arising from an unauthorized release of health records. Vohnoutka does not argue that the statute does not allow an award of damages for such an injury. A person who violates the act "is liable to the patient for compensatory damages." Minn. Stat. § 144.298, subd. 2. But the act does not describe the types of injuries for which compensatory damages may be awarded.

constant worry in addition to other symptoms." Vohnoutka contends that Huber has submitted only "bare, conclusory allegations which are insufficient to create a fact issue concerning damages."

Huber's evidence is similar to that of the plaintiff in *Navarre v. South Washington County Schools*, 652 N.W.2d 9 (Minn. 2002), who testified at trial that the defendant's conduct had "made her extremely upset and caused her to be afraid to go out in public." *Id*. at 30. The supreme court noted that the respondent's evidence of emotional distress was "conclusory and not substantiated by any medical testimony" but, nonetheless, was sufficient to allow her claim to be submitted to the jury. *Id*. In light of *Navarre*, Huber's evidence is sufficient to create a genuine issue of material fact on the factual question whether he experienced emotional distress and mental anguish. *Id*. Accordingly, we reject Vohnoutka's argument for affirming the district court's decision on alternative grounds.

In sum, the district court erred by granting summary judgment in favor of Vohnoutka on Huber's claim under the Minnesota Health Records Act.

**Reversed and remanded.**